235 F.2d 540
 Agnes Dale CROSBY, Appellant,
v.
The LOUDOUN NATIONAL BANK OF LEESBURG, and The National Bank of Fairfax, Appellees.
Agnes Dale CROSBY, Appellant,
v.
The LOUDOUN NATIONAL BANK OF LEESBURG, Appellee.
Agnes Dale CROSBY, Appellant,
v.
The PEOPLES NATIONAL BANK OF LEESBURG, Appellee.
Agnes Dale CROSBY, Appellant,
v.
The PEOPLES NATIONAL BANK OF LEESBURG, and J. S. Buck, and Edward Beans and Henry Thompson, d/b/a Beans & Thompson, Appellees.
 Nos. 7197-7200.
 United States Court of Appeals Fourth Circuit.
 Argued June 18, 1956.
 Decided July 13, 1956.
 
 John H. Dorsey, Washington, D. C. (F. Sheild McCandlish, Fairfax, Va., and Blum, Lindsey & Powell, Washington, D. C., on brief), for appellant.
 Armistead L. Boothe, Alexandria, Va., and J. Sloan Kuykendall, Winchester, Va. (Stilson H. Hall, Wilbur C. Hall, Leesburg, Va., and H. Wise Kelly, Jr., Fairfax, Va., on brief), for appellees.
 Before SOPER and PRETTYMAN, Circuit Judges, and TIMMERMAN, District Judge.
 PRETTYMAN, Circuit Judge.
 
 
 1
 In 1939 Mrs. Agnes Dale Crosby entered upon a cattle-raising venture on a farm she had acquired in Fairfax County, Virginia. Being inexperienced in the matter she employed a manager, one James M. King. On February 1, 1941, she gave King a written power of attorney, which constituted him her attorney and agent and empowered him:
 
 
 2
 "(1) To manage and operate my farms in Broad Run District in Loudoun County, Virginia, lying on the Potomac River, near Sterling, Va., containing about 1600 acres of land.
 
 
 3
 "(2) To buy any live stock to be fed and grazed or worked on the said farms, and sell same in my name.
 
 
 4
 "(3) To issue notes or contracts for the purchase of live stock, cattle, cows, hogs etc. to be fed and/or grazed on said farm.
 
 
 5
 "(4) To do all lawful acts requisite for effecting these premises, hereby ratifying and confirming all that the said attorney or agent shall do therein by virtue of these presents."
 
 
 6
 The farm was operated under the foregoing power for ten years. Then, in March, 1951, Mrs. Crosby gave King another power of attorney, identical with the earlier one except for paragraph (3), which in the new document read:
 
 
 7
 "(3) To execute notes, contracts or deeds of trust securing said notes for the purchase of live stock, cattle, cows, hogs etc. to be fed and/or grazed on said farm."
 
 
 8
 The main operation of the farm was the pasturing and feeding of cattle. Generally speaking, cattle were bought in the spring and sold in the fall, but sometimes they were kept over to the next spring or even the next fall. Mrs. Crosby had no funds with which to begin this operation and undertook it upon the basis of cattle loans. The process was to borrow money for the purchases and repay the loans when the cattle were sold. Mr. King was in complete charge of these financial dealings for Mrs. Crosby, conducting them under his powers of attorney. For the first ten years or more, or until about 1952, he dealt with the Peoples National Bank of Leesburg, Virginia, and thereafter he had some dealings with the Loudoun National Bank of the same place. In these transactions he borrowed money, gave notes and deeds of trust securing the notes, renewed notes, and paid off notes, being authorized to sign her name in such matters and in fact doing so. When cattle were sold King customarily sent Mrs. Crosby the sales sheet from the stockyards, the cancelled note from the bank, the deed of trust, if any, and the difference in money. Mrs. Crosby from time to time gave financial statements to the banks, including therein notations concerning the cattle operations.
 
 
 9
 King terminated his employment with Mrs. Crosby in September, 1953.
 
 
 10
 On January 21, 1954, Mrs. Crosby was notified by the Peoples Bank by letter that three notes signed by King as her agent, and secured by cattle, were past due. She thanked them for the notice and said she still had the cattle but was expecting to sell them and was getting in touch with Mr. King to that end. She asked if it would be possible to secure an extension on the loans. The Bank replied that it would renew the notes and that no doubt King would look after them. Then in March, May, June and July followed other notices to her of notes past due. These notes were thereafter renewed by King.
 
 
 11
 In August, 1954, it developed that for some period of time King had not been buying cattle with the money he borrowed and had not been devoting the proceeds of sales to the payment of the bank loans. King died suddenly on August 9th. Conferences between Mrs. Crosby and officials of the two banks resulted in the payment by her of the very considerable totals of the notes due, the funds being obtained by a mortgage on the farm.
 
 
 12
 Thereafter Mrs. Crosby brought the four civil actions which are now before us upon appeal. In the action which is No. 7197 in this court she sued the Loudoun Bank, the subject matter being two loans made by King on February 26 and March 25, 1954, for $8,800 and $6,000, respectively. She alleged that King had exceeded his authority when he made the loans, representing that they were to pay for cattle whereas he was converting the proceeds to his own use, and that the Bank was negligent. By amendment she alleged that King was without authority to endorse the checks given him by the Bank when the money was borrowed. She prayed for declaratory judgment that the notes were not valid.
 
 
 13
 In another action against the Loudoun Bank Mrs. Crosby alleged that King made a certain loan ($3,834 on December 23, 1952) secured by a deed of trust on cattle; that the note was twice renewed, once in July, 1954, when in fact there were no cattle on the farm; and that the Bank was negligent in renewing the note and was negligent in drafting the deed of trust by being so vague in the description of the cattle that this security could not be identified. She prayed judgment for recovery of the amount of the note she had been required to pay.
 
 
 14
 The third action, against the Peoples Bank and some individuals whose interest is not here material, was substantially the same in principle, with different notes, amounts, etc., as the action last-above described.
 
 
 15
 The fourth action was also against Peoples Bank and was based upon a personal note of King upon which Mrs. Crosby was an accommodation endorser. She alleged that King's note was purportedly secured by a deed of trust on cattle but that the description of the security in the deed was so vague that the property could not be identified, and thus she was deprived of recourse to that security for her protection. She claimed damages in the amount of the payment she was required to make.
 
 
 16
 The cases were tried together. At the close of the plaintiff's case the trial court dismissed the complaints, entering judgment for the defendant in its cross-claim in the action which is No. 7197 on appeal.
 
 
 17
 We agree with the views which the trial judge took of the issues in the controversy. In the first place we think the power of attorney was broad enough to support and justify all the transactions which the banks had with King. Not only does the text of the 1951 document, which is the one in effect during the defalcations, support that view, but the course of conduct of the parties over the whole period of twelve or thirteen years supports it.
 
 
 18
 Appellant argues that the bank had a duty to make certain that whenever a note was accepted or renewed the cattle were on hand as security. But we think no such duty existed. The power ran to the borrowing of money with which to purchase cattle, and thus cattle were not necessarily on hand when the money was secured. The power of attorney cannot be read, we think, as requiring that money be loaned only when cattle had already been bought. In other words we think the power of attorney did not require that every note be secured by a deed of trust; it authorized deeds of trust, it did not require them. In the second place, even if the banks had made certain that cattle were on hand when notes were made, Mrs. Crosby's position would not necessarily be aided materially, because admittedly part of King's dereliction occurred when he sold cattle and failed to apply the proceeds to the notes. It is not urged that the banks had a duty to insure that the proceeds of sales be paid to them. Such a requirement would obviously be impractical. It seems probable from this record that most of the appropriations of money by King were of funds received from sales rather than from the original loans; most of these notes were renewed after there were no cattle on the farm.
 
 
 19
 As we have indicated, the meaning of the plain texts of the powers of attorney to King is made more certain by the course of conduct of the parties over the years. To relate the evidence in detail would prolong this opinion unduly. Suffice it to say that the evidence was ample to support the District Court's conclusion in this respect.
 
 
 20
 The legal principle applicable to the foregoing part of the case is that under broad powers of attorney such as these a third party is not obliged to go behind the power; the agent becomes trustee for his principal, and a lender is not obligated to insure the proper application of the loaned funds.[1]
 
 
 21
 Appellant Crosby urges with special emphasis her contention that King had no power to endorse the checks which the banks gave him when they loaned him the money. But we agree with the District Court on the point. King had power of attorney to buy livestock, to execute notes for the purchase of such cattle, and to do all lawful acts "requisite for effecting these premises". Mrs. Crosby knew, and the banks knew she knew, that the method of operation was for the banks to loan King funds upon a note in her name and to give him checks for the amount of the loan and for him to endorse the checks. For example, Loudoun checks of December 23, 1952, March 16, 1951, and December 20, 1951, were endorsed by him. She testified she intended King to receive money from the banks. There was nothing illegal in his endorsement of the checks in her name, so long as he had her authority to do so. He plainly had such authority.
 
 
 22
 Mrs. Crosby urges that when the banks drew deeds of trust upon the cattle they were so vague in their descriptions that the security could not be identified. The deeds described the cattle by number, breed, color and weight. She says the banks should have insisted upon branding or tagging. She says the failure to do this deprived her of the opportunity of recovering the security. But she testified it was customary for King to send her the cancelled deeds of trust when he sent her the cancelled notes and that she examined those deeds. So she knew the nature and terms of the deeds. If she thought them insufficient for her protection she should have said so long before the unhappy events here involved occurred. The trusts were primarily for protection of the lender of the money. If she wanted a secondary protection she should have claimed it. Further in this respect it was shown by evidence that the terms of these deeds were those customary in the trade in Loudoun County in making cattle loans.
 
 
 23
 We think it is of some significance that many of these notes were executed or renewed with Mrs. Crosby's knowledge after King ceased to be her farm manager; she had not then cancelled his power of attorney. Had she been diligent in this respect so much harm might not have resulted.[2]
 
 
 24
 The District Court placed some reliance upon Mrs. Crosby's ratification of King's transactions with the banks. She paid the notes after she learned the full facts, and theretofore she had substituted new notes for the King notes. We agree that the ratification occurred, but we think it unnecessary to rest the decision in any part upon that fact.
 
 
 25
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 See Warren-Scharf Asphalt Pav. Co. v. Commercial Nat. Bank, 6 Cir., 1899, 97 F. 181; Brookfield Trust Co. v. Foster, 1922, 212 Mo.App. 347, 246 S.W. 617; 4 Bogert, Trusts and Trustees, § 767 (1948 ed.)
 
 
 [2]
 See Corbett v. Kleinsmith, 6 Cir., 1940, 112 F.2d 511