Armin GRABOWSKI, Herbert Blesch, Dieter Wurdig, Gunter Huber, Stephen Carter Corby, Thomas Kriesl, Willem Adriaanse, Klaus George Weigand, and Upclass Investments, Ltd., Plaintiffs,

v.

BANK OF BOSTON, Kinder Capital, Inc., Continental Capital Markets, Inc. Norman Epstein, Harold Glantz, Guido Haak and Arthur James Laycock, Defendants,

and

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Intervenor.

and

FRIONA LIMITED and Bernd Weber, Plaintiffs,

v.

BANK OF BOSTON, Kinder Capital, Inc., Continental Capital Markets, Inc. Norman Epstein, Harold Glantz, Arthur James Laycock, and John Does 1 through 100, Defendants,

and

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Intervenor.

Nos. 94–CV–11461–PBS, 94–CV–12201–PBS.

United States District Court, D. Massachusetts.

Aug. 7, 1997.

Michael A. Collora, Dwyer & Collora, Boston, MA, for Gunter Huber, Stephen Carter Corby, Thomas Kriesl.

Robert Axelrod, Axelrod, Lanzoni & Teague, Meriden, CT, Michael A. Collora, Dwyer & Collora, Boston, MA, for Willem Adrianse, Upclass Investments, Ltd.

Robert Axelrod, Axelrod, Lanzoni & Teague, Meriden, CT, Michael A. Collora, Dwyer & Collora, Boston, MA, Christopher Weld, Jr., Todd & Weld, Boston, MA, for Klaus George Weigand.

Harold Jacobi, III, Robert C. Cooley, Jacobi & Associates, Boston, MA, for Bernd Weber.

Robert Christo, Robert Christo & Associates, Springfield, MA, Timothy M. Kotfila, Law Office of Timothy Kotfila, Springfield, MA, for National Union Fire Ins. Co., Pittsburgh.

Thomas H. Walsh, Jr., S. Elaine McChesney, Peter J. Mancusi, Laura A. Clark, Bingham, Dana & Gould, Boston, MA, for Bank of Boston.

Richard Ben–Veniste, Weil, Gotshal & Manges, Washington, DC, for Continental Capital Markets, Inc., Harold Glantz.

David J. Burgess, Michael A. Collora, Dwyer & Collora, Boston, MA, for Dieter Wurdig.

## MEMORANDUM AND ORDER ON MOTIONS AND CROSS–MOTIONS FOR SUMMARY JUDGEMENT

SARIS, District Judge.

### INTRODUCTION

These cases arise out of an investment scheme operated by Kinder Capital ("Kind-

er") involving so-called "prime bank instruments"—a non-existent security. At the direction of Kinder Capital's agents, plaintiffs Armin Grabowski, Herbert Blesch, Dieter Wurdig, Gunter Huber, Stephen Carter Corby, Thomas Kriesl, Willem Adriaanse, Klaus George Weigand, Upclass Investments, Friona Ltd., and Bernd Weber deposited approximately $21 million in various accounts at the Bank of Boston ("the Bank"). All of these accounts were subject to a power of attorney drafted by Kinder for Norman Epstein, who was given authority to operate the accounts so long as the account balance of cash, invoices, and prime bank instruments did not drop below the amount of their initial deposits. Epstein used Kinder's power of attorney to abscond with the plaintiffs, money by withdrawing substantially all of their funds.[1] The plaintiffs have sued the Bank, Kinder, Epstein, and others to recover their funds.

The present controversy before the Court concerns various motions for summary judgment. The plaintiffs have moved for summary judgment against the Bank, and the Bank has cross-moved for summary judgment. The main issue in all these motions is whether the power of attorney granted by plaintiffs to Epstein limited his authority to draw against plaintiffs, accounts. The Court has concluded with one exception that it does, and that therefore the Bank is liable for the unauthorized withdrawals by Epstein at issue in this case.

### FACTS & PROCEDURAL HISTORY

█ The following are the facts material to the resolution of these motions. Disputed facts are noted as necessary.[2]

1. Defendants Epstein, Glantz and Laycock are under indictment in *United States v. Glantz,* Cr. 94–10200–JLT (D.Mass.), on criminal charges related to these accounts.

2. The Bank argues that plaintiffs (except Friona) failed to file statements of fact disputing the facts submitted by the Bank in its motion for summary judgment. Under Local Rule 56.1:

 Material facts of record set forth in the statement required to be served by the moving party will be deemed to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties.

In 1993, the Kinder defendants through its agents—Uwe Schwabe, Norbert Goebel, Helmut Hagenlucke, Tony Verillo and Harry Turkington—began soliciting the plaintiffs to participate in an investment program operated by Kinder Capital, Inc. ("Kinder" or "Kinder program") to buy and sell prime bank instruments.[3] These agents represented that the Kinder program was low risk because Kinder would not have the ability to take funds out of their bank accounts without replacing them with an equivalent amount of prime bank instruments or invoices for prime bank instruments and because the program yielded returns in excess of 200 percent.

The plaintiffs took the bait and entered into investment agreements with Kinder that provided that they would grant a power of attorney to Kinder "for the purpose of giving instructions to the Bank to buy and sell prime bank instruments ... or invoice[s] ... for said instruments." The agreements further provided that the "power of attorney shall be lodged with the Bank, and the Bank will control said power of attorney to insure that the client's account at all times contains the client's funds either in cash and/or bank authenticated prime bank instruments of credit." Plaintiffs were told that they should open accounts with the Bank of Boston and deposit their funds in those accounts. Plaintiffs were also told that they must execute a power of attorney granting Norman Epstein, Kinder's principal, control over the accounts. Kinder's agents told them that this power of attorney would protect their funds and that the account would hold cash and securities, which the Bank would authenticate.

Kinder's power of attorney stated as follows:

Only Friona formally disputed the Bank's statement of facts in its opposition to the Bank's motion. The other plaintiffs relied on their statements of facts made in support of their own summary judgment motions to dispute the Bank's statement. In these circumstances, the Court declines to deem the Bank's facts to be admitted pursuant to Local Rule 56.1.

3. At least according to the Securities and Exchange Commission, prime bank instruments do not exist. *See SEC v. Lauer,* 52 F.3d 667, 669 (7th Cir.1995); *SEC v. Bremont,* 954 F.Supp. 726, 727 (S.D.N.Y.1997).

To: Bank of Boston

*POWER OF ATTORNEY*

This power of attorney made this [date] by [account holder].

Witness as follows:

The Customer hereby appoints Kinder Capital, Inc. of 400 Paradise Road Suit C2E, Swampscott, MA 01907 USA and/or Mr. Norman Epstein (hereinafter called the "Attorney") to be the Attorney of the Customer to give instructions and to take all actions in the name of the Customer and on the Customer's behalf required of the Customer to operate the Account.

This Account is solely for the buying and selling of Prime Bank Instruments of Credit. This Account at all time shall contain cash and/or Prime Bank Instruments of Credit, or invoices committing to deliver Prime Bank Instruments of Credit to a purchasing bank on behalf of [account holder] in an amount of not less than the initial cash deposited. The purchasing bank shall be irrevocably instructed to remit payment for the letter of credit directly to Client's bank account no. [number] at Bank of Boston.

Set out at the foot of this Power of Attorney is the specimen signature of the Attorneys.

In witness whereof the signature of the Customer was hereunto affixed the day and year first above written.

[Signed by account holder]

[Witnessed by bank personnel]

[Specimen signature of attorney]

After the plaintiffs executed the Investment Agreements, they opened their accounts and executed powers of attorney as follows.[4]

*Blesch, Wurdig, Grabowski, Wellauer, Weber and Lonneman, Accounts.* On three separate occasions Laycock took groups of plaintiffs to the London Branch of the Bank of Boston where they met with Stuart B. Patterson, a private banking officer, and completed account opening documents for accounts at the Bank's Marblehead, Massachusetts, branch. At different times, these groups of plaintiffs—Blesch, Wurdig, and Corby; Grabowski and Wellauer; Weber (for Friona); and Blesch, Lonneman, and Corby—presented their passports for the Bank to photocopy, and signed signature cards and Kinder's power of attorney, which Patterson witnessed and kept on file at the Bank. Weber, as authorized agent for Friona, an Isle of Man entity, also completed a "Commercial Deposit Account Resolution ." This resolution contained an indemnity provision for unauthorized funds transfers [5] made by the Bank in good faith. Within a few days of opening their accounts, the plaintiffs deposited millions of dollars into them.

*Huber/Corby Account.* On September 13 or 14, 1993, Epstein opened a joint account in the names of Stephen Corby or Gunter Huber.[6] That same day, Corby, as a joint account-holder, executed a Kinder power of attorney over this account and two other accounts on which Corby was a co-signor. Corby denies that the power of attorney was signed on September 15th. However, the Kinder power of attorney itself states that it was "made this 15th day or September,

---

4. The following are the accounts opened by the plaintiffs at the Bank of Boston and the approximate amount of money deposited:

| Account Holders | Acct. # | Date | Amount |
| --- | --- | --- | --- |
| Weber (Friona) | 500–8608 | 9–28–93 | $5 million |
| Huber/Kriesl/Corby | 640–17693 | 9–24–93 | $3.5 million |
| Blesch/Lonneman/Corby | 640–17033 | 1–27–94 | $4.5 million |
| Blesch/Wurdig/Corby | 640–1553 | 12–16–93 | $3.5 million |
| Grabowski/Wellauer | 854–68968 | 10–9–93 | $2 million |
| Adriaanse/Weigand (Upclass) | 603–32758 | 9–12–93 | $2.5 million |

5. "Funds transfers" is a term of art used under article 4A of the UCC most commonly used to refer to wire transfers.

6. Huber contends that it is not clear who opened this account and that Epstein inserted the "or" in the account instead of "and."

1993." (*See* Huber & Kriesl Statement of Undisputed Facts, Ex. F.)

On September 15, 1993, Huber sent a wire transfer of $3.5 million to the attention of the Marblehead Branch Manager with the message: "To be held for further direct instructions from Gunter Huber." The wire transfer did not identify a Bank of Boston account into which the money was to be deposited or a beneficiary. However, the Bank construed Huber's instruction to hold the funds as being directed to the beneficiary of the transfer, not it, and deposited this money in the Huber/Corby account. The next day, September 16, 1993, Epstein wired $3.41 million out of the Huber/Corby account to an account under Kinder's control.

Huber signed two Kinder powers of attorney. On September 21, 1993, he signed a "provisional" power of attorney that was very similar to the Kinder power of attorney signed by the other plaintiffs. (*See* Huber & Kriesl Statement of Undisputed Facts, Ex. O.) On September 24, 1993, Huber executed a second Kinder power of attorney that was backdated to September 16—the date that Epstein withdrew most of $3.5 million from the account. On that same date he and Corby signed a signature card and a Bank form power of attorney with no designated attorney. (*See* Huber & Kriesl Statement of Undisputed Facts, Ex. B.) The Bank contends that the back-dated Kinder power of attorney signed by Huber ratified Epstein's September 16th withdrawal. The Bank power of attorney granted Epstein general, unlimited authority to operate the account.

*Upclass Account.* On August 12, 1993, Adriaanse and Weigand opened an account on behalf of Upclass Investments at Bank of Boston's Frankfurt Branch with the assistance of the Bank's employee, Roswitha Campbell. Adriaanse and Weigand signed two signature cards, one of which was later stamped "two signatures required," Kinder's power of attorney, a "Corporate Resolution for Opening and Maintaining Corporation Accounts," and a "Commercial Deposit Account Resolutions and Authorities." The parties dispute whether Epstein's typewrit-

ten name appeared on the documents at the time they were signed. Adriaanse testified that it was not and infers that the Bank altered it at some later date. The Bank denies this and points to circumstantial evidence tending to show that Epstein's name did appear at the time the account holders signed the documents. In any event, the Corporate Account Resolution contained an indemnity provision for unauthorized fund transfers made by the Bank in good faith and provided that for signings, two signatures were required. It also contained a provision that Epstein was authorized for wire transfers only—a provision that the account holders claim was added after they executed the document. The Kinder power of attorney contained no limitation to two signatories to operate the account.

After the transfer of money into plaintiffs, accounts, Epstein, acting pursuant to the powers of attorney conferred on him by plaintiffs, instructed the Marblehead branch of the Bank to make various wire transfers of sums from each of the plaintiffs' accounts without replacing the funds with an equivalent amount of prime bank instruments or invoices. The Bank states that it complied with Epstein's instructions in reliance on the powers of attorney. (Bank of Boston's Mem. in Support of Mot. for Summary Judgment, at 9.)

The plaintiffs in two groups sued the Kinder defendants and the Bank in two separate law suits. Plaintiffs Armin Grabowski, Herbert Blesch, Dieter Wurdig, Gunter Huber, Stephen Corby, Thomas Kriesl, and Upclass Investments Limited [7] (the "Grabowski plaintiffs") in *Grabowski v. Bank of Boston* (No. 94–11461) and Friona Ltd. and Weber (the "Friona plaintiffs") *Friona Ltd. v. Bank of Boston* (No. 94–12201), alleged, among other things, that the Bank is liable for the unauthorized withdrawals of their money. The two suits were consolidated for decision in this case. The Grabowski plaintiffs seek summary judgment against the Bank on their claims for breach of contract on the deposit agreement (Third Amended Complaint Count IX), negligence (Count VII),

7. The remaining plaintiffs in the Grabowski suit—Klaus Weigand and Willem Adriaanse—did not participate in the summary judgment motions.

and a violation of article 4A of the Uniform Commercial Code ("UCC 4A") for an unauthorized wire transfer (Count XII). The Grabowski plaintiffs have brought six separate motions for summary judgment against the Bank: 1) Grabowski, Blesch, Corby, Wurdig, and Kriesl (Counts IX & XII); 2) Blesch (Counts IX & XII); 3) Huber (Counts VII, IX & XII); 4) Upclass Investments (Counts VII, IX & XII); 5) Kriesl (Counts IX & XII); and 6) Blesch and Wurdig (Counts IX & XII). The Friona plaintiffs moved for summary judgment against the Bank on their count under article 4A of the UCC (Amended Complaint Count XII). Defendant Bank of Boston[8] cross-moved for summary judgment on all counts against it: negligence; negligent misrepresentation; deceit; breach of contract (deposit agreement); breach of contract (power of attorney); UCC article 4A; money had and received; money lent; and Mass.Gen.L. ch. 93A.

### STANDARD OF REVIEW

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 36 (1st Cir.1995) (quoting Fed.R.Civ.P. 56(c)), *cert. denied,* 516 U.S. 1113, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair,* 902 F.2d 140, 143 (1st Cir. 1990); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Barbour,* 63 F.3d at 37 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers,* 902 F.2d at 143 (quoting *Anderson,* 477 U.S. at 249–50). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour,* 63 F.3d at 36.

### CHOICE OF LAW

A federal district court sitting in diversity must interpret and apply state substantive law. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In determining which state's law to apply, the court is governed by the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *see Brennan v. Carvel Corp.,* 929 F.2d 801, 806 (1st Cir. 1991).

Under Massachusetts law, the law of the jurisdiction with the "most significant relationship" to the transaction governs the dispute. *See* 929 F.2d at 806 (Massachusetts courts apply the "most significant relationship" test in determining choice of law); *accord Bi–Rite Enterprises Inc. v. Bruce Miner Co.,* 757 F.2d 440, 442 (1st Cir.1985). In determining the "most significant relationship," the Massachusetts Supreme Judicial Court has delineated a list of factors fur resolving the choice of law issue. *Bushkin Associates, Inc. v. Raytheon, Co.,* 393 Mass. 622, 632, 473 N.E.2d 662 (1985). These factors include "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Id.* The Court concludes, based on these factors, that Massachusetts is the jurisdiction with the "most significant relationship" to the transactions.

---

8. The remaining defendants—Kinder Capital, Inc., Continental Capital Markets, Inc., Norman Epstein, Harold Glantz, Guido Haak, and Arthur Laycock—did not participate in these motions.

Disputes arising out of article 4A of the Uniform Commercial Code as adopted in Massachusetts are subject to a special choice of law rule. "The rights and obligations between the sender of a payment order and the receiving bank are governed by the law of the jurisdiction in which the receiving bank is located." Mass.Gen.L. ch. 106, § 4A–103(a)(1). The receiving bank in this case is Massachusetts.

■ Where Massachusetts' highest court has decided an issue, that law is controlling. However, if Massachusetts has no controlling authority, the Court will predict how the Massachusetts Supreme Judicial Court would decide if presented with the question. *New Ponce Shopping Center v. Integrand Assur. Co.*, 86 F.3d 265, 267 (1st Cir.1996) (citing *Nieves v. University of Puerto Rico*, 7 F.3d 270, 274–75 (1st Cir.1993)). "In the absence of a definitive ruling by the highest state court, a federal court may consider analogous decisions, considered dicta, scholarly works, and any other data tending to show how the highest court in the state would decide the issue at hand, taking into account the broad policies and trends so evinced." *Gibson v. City of Cranston*, 37 F.3d 731, 736 (1st Cir. 1994) (quoting *Michelin Tires (Canada), Ltd. v. First Nat'l Bank*, 666 F.2d 673, 682 (1st Cir.1981)).

*DISCUSSION*

## I. ARTICLE 4A—UNAUTHORIZED WIRE TRANSFERS

The parties have cross-moved on plaintiffs, claims that the Bank's wire transfers made at the direction of Epstein violated Article 4A of the Uniform Commercial Code, which requires a sending bank to reimburse account holders for unauthorized wire transfers. Construing all disputed facts in favor of the Bank, the Court concludes that the Bank is liable for a violation of article 4A for transactions on the plaintiffs' accounts with one exception. Construing all disputed facts in favor of the plaintiffs, the Court concludes that the Bank is not liable under article 4A for transactions on the Huber/Corby account on or after September 24, 1993 because Ep-

stein's transactions were authorized by the Bank's general power of attorney.

### A. *Notice Requirement & Indemnity Agreement*

■ Before reaching the merits of the plaintiffs, article 4A claims, the Court must first consider two threshold issues raised by the Bank. The Bank argues that these claims are barred under article 4A's "one-year statute of limitations," and the claims by the two corporate plaintiffs, Upclass and Friona, are defeated by the indemnity provision in their Commercial Deposit Account Resolutions.

Section 4A–505 of Article 4A provides that:

> If a receiving bank has received payment from its customer with respect to a payment order issued in the name of the customer as sender and accepted by the bank, and the customer received notification reasonably identifying the order, the customer is precluded from asserting that the bank is not entitled to retain the payment unless the customer notifies the bank of the customer's objection to the payment within one year after the notification was received by the customer.

Mass.Gen.L. ch. 106, § 4A–505. The official comment states that "[t]his section is in the nature of a statute of repose for objecting to debits made to the customer's account. . . . Under 4A–505, . . . the obligation to refund may not be asserted by the customer if the customer has not objected to the debiting of the account within one year after the customer received notification of the debit." Mass. Gen.L. ch. 106, § 4A–505 off. com.

Contrary to the Bank's assertion, this provision does not create a statute of limitations on the time allowed to bring suit under article 4A. Instead, it creates a one year notice requirement. *Cf. Jensen v. Essexbank*, 396 Mass. 65, 66, 483 N.E.2d 821, 822 (1985) (interpreting a similar provision in article 4 as a notice provision); *see generally* J. Kevin French, *Article 4A's Treatment of Fraudulent Payment Orders—The Customer's Perspective*, 42 ALA.L.REV. 773, 820 (1991) ("The requirement to notify within one year is in the nature of a statute of repose for objecting to debits made to the customer's

account."). It is undisputed here that the plaintiffs gave timely notice to the Bank after learning of Epstein's withdrawals from their accounts. Thus, the requirements of § 4A–505 have been met.

■ The Bank's second argument that Upclass and Friona's article 4A claims are defeated by the indemnity provision in the commercial deposit agreement is likewise without merit. The indemnity provision of the Commercial Deposit Account Resolutions provides that the Bank is "hereby relieved from liability for errors, omissions, or *unauthorized transfers* that it may make, provided that it acts in good faith." (emphasis added). This provision is not enforceable as a matter of law under article 4A.

Under section 202(a) of article 4A, a bank is liable for unauthorized funds transfers. Mass.Gen.L. ch. 106, § 202(a). However, under section 4A–202(b) this default rule is subject to variation by agreement if a bank and its customer agree on a security procedure for verification of the authenticity of a payment order. Mass.Gen.L. ch. 106, § 202(b). Such an agreement places the risk of loss on the customer for unauthorized payment orders if an unauthorized payment order is accepted by a receiving bank after verification by the bank in compliance in good faith with a commercially reasonable security procedure. Mass.Gen.L. ch. 106, § 202 off. comm. 5–(6). However, except to the extent just stated, rights and obligations relating to authorized and verified payment orders "may *not* be varied by agreement." Mass.Gen.L. ch. 106, § 4A–202(f) (emphasis added); *see also* Mass.Gen.L. ch. 106, § 4A–202 off. comm. 7.

The Commercial Deposit Account Resolution relied on by the Bank here is not an enforceable modification of the loss allocation scheme set forth in article 4A because it concerns a general modification of liability under article 4A without an accompanying commercially reasonable security procedure. In contrast to the general modification of liability in the Commercial Deposit Account Resolution, the Bank's "Money Transfer Service Order" agreement concerns security

procedures such as recorded phone calls, "SecurId," and telephone orders with a possible Callback or request for identification.[9] None of these procedures are included in the Commercial Deposit Account Resolution. Consequently, because the Account Resolution is a modification of the baseline loss allocation scheme of article 4A and not an agreement on a security procedure, the general indemnity provision relating to unauthorized payment orders is unenforceable under the plain language of section 202(f) of article 4A.

The Court now turns its attention to the merits of the plaintiffs' article 4A claims.

### B. *Article 4A*

In 1991, Massachusetts enacted Article 4A of the Uniform Commercial Code. Mass. Gen.L. ch. 106, § 4A–101 *et seq.* codifying St.1991, c. 286, § 3 (effective Jan. 1, 1992). Article 4A was developed because there "was no comprehensive body of law—statutory or judicial—that defined the juridical nature of a funds transfer or the rights and obligations flowing from payment orders." Mass.Gen.L. ch. 106, § 4A–101 off. com. The drafters of article 4A made

a deliberate decision ... to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment. A deliberate decision was also made to use precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability, rather than to rely on broadly stated, flexible principles. In the drafting of these rules, a critical consideration was that the various parties to funds transfers need to be able to predict risk with certainty, to insure against risk, to adjust operational and security procedures, and to price funds transfer services appropriately. This consideration is particularly important given the very large amounts of money that are involved in funds transfers.

---

**9.** The issue of the enforceability of the security procedure set forth in the "Money Transfer Ser-

vice Order" is taken up in section I(B)(2)(a) of the Court's opinion.

*Id.* The drafters' aim was to achieve national uniformity, speed, efficiency, certainty, and finality in the funds transfer system. *Banque Worms v. BankAmerica Int'l,* 77 N.Y.2d 362, 568 N.Y.S.2d 541, 570 N.E.2d 189, 195 (1991).

Under article 4A, "funds transfers," are defined as "the series of transactions, beginning with the originator's *payment order,* made for the purpose of making payment to the beneficiary of the order." Mass.Gen.L. ch. 106, § 4A–104(a) (emphasis added). A funds transfer involves a series of events that begins when a "sender" or the sender's agent gives an instruction to pay a beneficiary to a "receiving bank." Mass.Gen.L. ch. 106, 4A–103(a)(1)–(5). The receiving bank then transmits the instruction to the beneficiary's bank. *Id.* The beneficiary bank credits the beneficiary's account, and the receiving bank is reimbursed by debiting the sender's account or otherwise receiving payment from the sender. Mass.Gen.L. ch. 106, § 4A–103(a)(1)(ii).

### 1. Payment Order

Article 4A is triggered by the placement of a "payment order" with the receiving bank. *See* Mass.Gen.L. ch. 106, § 4A–104(a). A "payment order" is "an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay, or cause another bank to pay, a fixed or determinable amount of money to a beneficiary." Mass. Gen.L. ch. 106, § 4A–103(a)(1). The Bank argues that Epstein's withdrawals were not payment orders because his instructions were subject to a condition and because they constituted debit, not credit, transfers.

### a) Conditional Instructions

█ An instruction that contains a condition to payment to the beneficiary other than the time of payment is not a payment order. *See* Mass.Gen.L. ch. 106, § 4A–103(a)(1)(i). For example, in the case of a letter of credit that requires a shipper of goods to provide proof of shipment before it is paid, if an instruction to the beneficiary bank requires a delay in payment until it receives documents to prove the shipment of goods, the instruction is conditional and does not constitute a

payment order. *See* Mass.Gen.L. ch. 106, § 4A–104, off. com. 3. Such conditions are anathema to article 4A, which facilitates the low price, high speed, and mechanical nature of funds transfers. *Id.* However, in the same case if the receiving bank erroneously instructs beneficiary bank to pay the shipper without first meeting the condition, the instruction is an article 4A payment order. *Id.*

█ Epstein's instructions to the Bank of Boston constitute an unconditional payment order. In making this determination based on the rationale in the official commentary, the Court must focus on conditions in the instruction itself, and not conditions contained in other documents. Although pursuant to the Kinder power of attorney, the instruction should have included a condition of receipt of prime bank invoices or prime bank instruments, the erroneous omission of that condition is sufficient to make the instruction unconditional for the purposes of article 4A. Mass.Gen.L. ch. 106, § 4A–104, off. com. 3 ("[I]f the [receiving] bank erroneously sent an instruction to the [beneficiary] bank unconditionally instructing payment to [the beneficiary], the instruction would have been an Article 4A payment order."). However, the sender would still be entitled to recover the erroneously transmitted funds "under the law of mistake and restitution, letter of credit law or other applicable law." *Id.*

### b) Debit Transfers

█ In addition, article 4A does not apply to "debit transfers." Mass.Gen.L. ch. 106, § 4A–104, off. com. 4; Mass.Gen.L. ch. 106, § 4A–103(a)(1)(ii) ("such receiving bank is to be reimbursed by a debiting of an account of, or otherwise receiving payment from, the sender."). "In a debit transfer the instruction to pay is given by the person receiving payment." Mass.Gen.L. ch. 106, § 4A–104, off. com. 4. The official comment states:

In a debit transfer, a creditor, pursuant to authority from the debtor, is enabled to draw on the debtor's bank account by issuing an instruction to pay to the debtor's bank. If the debtor's bank pays, it will be reimbursed by the debtor rather

than by the person giving the instruction. For example, the holder of an insurance policy may pay premiums by authorizing the insurance company to order the policyholder's bank to pay the insurance company. The order to pay may be in the form of a draft covered by Article 3, or it might be an instruction to pay that is not an instrument under that Article. . The bank receives reimbursement by debiting the policyholder's account. Or, a subsidiary corporation may make payments to its parent by authorizing the parent to order the subsidiary's bank to pay the parent from the subsidiary's account. These transactions are not covered by Article 4A because subparagraph (2) is not satisfied. Article 4A is limited to transactions in which the account to be debited by the receiving bank is that of the person in whose name the instruction is given.

Mass.Gen.L. ch. 106, § 4A–104, off. com. 4. The question is whether Epstein's withdrawals from the Bank were credit transfers governed by article 4A. Epstein transferred these funds from the Bank of Boston to accounts at other banks under his control. Consequently, the Bank argues half-heartedly that Epstein's withdrawals were debit transfers because Epstein, who gave the instruction to pay, was also the beneficiary of the instruction. *See* Mass.Gen.L. ch. 106, § 4A–104, off. com. 4. However, this fact alone is not sufficient to make these transactions debit transfers for three reasons. First, although Epstein was nominally the "person" giving the instructions, he was in fact acting as the attorney-in-fact of the plaintiffs pursuant to the Kinder power of attorney. As their agent, he was not acting on his own behalf, but for the account holders—the true "senders" of the instruction. "The term 'sender' in this Article includes the customer in whose name a payment order is issued if the order is the authorized order of the customer under subsection (a), or it is effective as the order of the customer under subsection (b)." Mass.Gen.L. ch. 106, § 4A–202(d). As such, this was not a transaction from Epstein in his personal capacity to himself, but rather a transaction from the agent of the account holders to himself as

Kinder's principal. *Cf.* Mass.Gen.L. ch. 106, § 4A–104, off. com. 4 ("If the beneficiary of a funds transfer is the originator of the transfer, the transfer is governed by Article 4A if it is a credit transfer *in form.*") (emphasis added).

Second, Epstein and the plaintiffs were not in a debtor-creditor relationship. Article 4A describes the sender of a debit transfer as the account holder's creditor. *Cf.* Mass. Gen.L. ch. 106, § 4A–104, off. com. 4 ("In a debit transfer, *a creditor,* pursuant to authority from the debtor, is enabled to draw on the debtor's bank account....") (emphasis added). There is no evidence in this record to suggest that Epstein stood in the relationship of a creditor to the plaintiffs. Thus, his transactions cannot be described as debit transfers on this ground.

Third, an interpretation of article 4A that would make Epstein's withdrawals debit transfers would defeat a major goal of the drafters: to allocate liability for fraudulent transfers. *See generally* French, *supra,* 42 ALA.L.REV. at 774 (stating that the treatment of fraudulent payment orders was "one of the chief problems confronting the drafters of Article 4A."). Indeed, as the Court discusses below, article 4A establishes detailed rules governing liability for fraudulent transfers. An obvious characteristic of a fraudulent wire instruction is that the payment order is made by the unauthorized person for payment to the unauthorized person. Accordingly, article 4A requires something more than the fact that the sender and the beneficiary as the same person before the transaction will be taken out of its ambit.

The Court concludes based on the foregoing that Epstein's instructions to the Bank constituted "payment orders" that triggered the rules of Article 4A. Accordingly, the Court now turns its attention to liability for the losses caused by these orders.

## 2. Loss Allocation Under Article 4A

Article 4A requires a bank to reimburse account holders for the amount of unauthorized funds transfers from their accounts with interest.

If a receiving bank accepts a payment order issued in the name of its customer as sender which is (i) not authorized and not effective as the order of the customer under section 4A–202, ... the bank shall refund any payment of the payment order received from the customer to the extent the bank is not entitled to enforce payment and shall pay interest on the refundable amount calculated from the date the bank received payment to the date of the refund.

Mass.Gen.L. ch. 106, § 4A–204(a).

Article 4A provides two paths for loss allocation of payment orders: verification by a security procedure and/or authorization by the customer.

### a) Security Agreement

█ A bank can protect itself from liability for unauthorized transfers by agreeing with the customer on the use of a commercially reasonable security procedure and complying with it and any other agreement it has in place with the customer. Article 4A provides:

If a bank and its customer have agreed that the authenticity of a payment order issued to the bank in the name of the customer as sender will be verified pursuant to a security procedure, a payment order received by the receiving bank is effective as the order of the customer, whether or not authorized, if (i) the security procedure is a commercially reasonable method of providing security against an unauthorized payment order, and (ii) the bank proves that it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of such customer restricting acceptance of a payment order issued in the name of such customer. The bank is not required to follow an instruction that violates a written agreement with the customer....

Mass.Gen.L. ch. 106, § 4A–202(b).

Section 4A–202(b) does not eliminate the Bank's liability for Epstein's transfers. The Bank argues that it was protected because Epstein selected security procedures for his wire transfers and that the Kinder power of attorney authorized him to enter into such agreements with the Bank because these were mere "administrative actions" over the account. However, § 4A–202(b) plainly requires that the security procedure be agreed to between the "bank *and its customer*." Mass.Gen.L. ch. 106, § 4A–202(b) (emphasis added); *see generally* French, *supra*, 42 ALA.L.REV. at 785–86 ("For subsection 4A–202(b) to apply, the customer and its bank must agree that the authenticity of payment orders will be verified by a security procedure."). In addition, Epstein's security agreement with the Bank was in place more than a year before the plaintiffs had even opened their accounts and lists only a Kinder Capital account, not the plaintiffs, accounts.

Moreover, even if the security agreement were properly agreed to and complied with, § 4A–202(b) does not relieve the Bank from its duty to adhere to "any written or agreement or instruction of [the] customer restricting acceptance of a payment order issued in the name of such customer," i.e., the limitations on Epstein's authority in the Kinder power of attorney. Mass.Gen.L. ch. 106, § 4A–202(b)(ii); *see generally* French, *supra*, 42 ALA.L.REV. at 785–86 ("The requirement that a receiving bank follow its customer's instructions is significant because it gives customers some amount of leverage in their funds transfer relationship with their receiving banks."). The Court now turns its attention to the second type of loss allocation under article 4A—customer authorization of funds transfers.

### b) Authorized Funds Transfers

█ Since the Bank did not have a valid security agreement in place, it is liable for Epstein's withdrawals unless the plaintiffs were bound to Epstein's Acts pursuant to Kinder's power of attorney. Normally, in the absence of a security agreement, a bank's liability turns on the law of agency. *See* Mass.Gen.L. ch. 106, § 4A–202(a) ("A payment order received by the receiving bank is the authorized order of the person identified as sender if such person authorized the order or is otherwise bound by it under the law of agency."). However, article 4A also provides that the extent of the person's authority, and

commensurately, the bank's liability, can turn on the existence of an agreement addressing the nature of the person's authority. Mass. Gen.L. ch. 106, § 4A–203, off. com. 1 ("In the absence of a statute or *agreement* that specifically addresses the issue, the question usually will be resolved by the law of agency.") (emphasis added). Because such an agreement exists here in the form of the deposit agreement and the Kinder power of attorney, the Court must determine the scope and validity of the contract between the plaintiffs and the Bank concerning the extent of the authority granted to Epstein to operate their accounts. In essence, the Court must determine the nature of the contract between the plaintiffs and the Bank and whether the Bank breached its contractual duties under that contract by permitting Epstein to withdraw their funds from the Bank of Boston accounts.

### C. *The Agreement Between the Plaintiffs and the Bank*

#### 1. Power of Attorney As Part of the Deposit Agreement

 "The relation of banker and depositor is a voluntary one, and arises out of contract. The relation cannot be created without a meeting of the minds, one to propose and the other to accept." 5A *Michie on Banks and Banking* § 15 at 66 (1994). Under Massachusetts law, an implied contract may be created by the bank's acceptance of a deposit subject to the depositor's instructions. In *Mohan v. Woburn National Bank,* the Massachusetts Supreme Judicial Court explained:

> We think there can be no question as to the right of a depositor to direct the manner in which a deposit shall be used. He must have the right to say what he will do with his own money, and we know of no rule that requires a bank to accept a deposit unless it wishes. We think that, if money or its equivalent is offered to a bank by way of deposit with specific directions as to what shall be done with it, the bank is under an obligation to comply

with those directions if it accepts the deposit.

313 Mass. 306, 310, 47 N.E.2d 289, 291–92 (1943); *accord* 5A *Michie on Banks and Banking* § 40 at 161–62 (1994) ("A bank deposit is subject to any agreement which the depositor and the banker may make as to it.... Thus, the depositor may stipulate as to the manner in which or by whom the money in an account may be drawn out....").

 Although no Massachusetts court has decided this issue, the Court concludes that a depositor's instructions as set forth in a power of attorney is an acceptable manner in which to exercise a depositor's "right to say what he will do with his own money." *Mohan,* 313 Mass. at 310, 47 N.E.2d at 292. If the Bank does not wish to be bound to these instructions, all it need do is to refuse the power of attorney and the accompanying deposit. Consequently, because the Bank accepted the power of attorney and later the plaintiffs, general deposit of millions of dollars, an implied contract arose between the parties that required the accounts to be operated in accord with the depositor's instructions.[10]

Having decided that the Kinder power of attorney was binding on the Bank as part of the deposit agreement, the Court turns next to the scope of authority conferred on Epstein pursuant to the power of attorney.

The Bank argues that the power of attorney conferred on Epstein a general, unlimited authority to operate the plaintiffs' accounts and that the limitations in the power of attorney related only to the fiduciary relationship between the plaintiffs and Epstein and not to it. If Epstein had general authority over the account, the Bank is not liable for breach of the deposit agreement. *See, e.g., Empire Trust v. Cahan,* 274 U.S. 473, 479, 47 S.Ct. 661, 71 L.Ed. 1158 (1927) (pre-*Erie* federal common law); *Nashville Trust v. Southern Buyers, Inc.,* 40 Tenn.App. 11, 288 S.W.2d 469, 471–72 (1956); *Milner v. Milner,* 183 W.Va. 273, 395 S.E.2d 517, 521 (1990); *Bank IV, Olathe v. Capitol Federal*

---

**10.** Because the Court concludes that a contract was created, it need not reach the merits of the

plaintiff's promissory estoppel argument.

*Savings & Loan Ass'n,* 250 Kan. 541, 828 P.2d 355, 364–65 (1992); *Long v. Watkins,* 271 F.Supp. 630, 633 (E.D.Ky.1967).

For their part, the plaintiffs argue that the power of attorney created only a limited authority to operate their accounts because it set a number of conditions for the operation of the bank account that should have prevented him from making these withdrawals. If Epstein's authority was limited, the Bank is liable for his unauthorized withdrawals. *See, e.g.,* 5A *Michie on Banks and Banking* § 175 at 686 (1994) ("A bank is protected in paying out a deposit only on an order from the owner of the deposit himself *or one authorized to act for him.*") (emphasis added); *id.* § 178 at 696 ("Before the bank can charge the account of its depositor with the check of another, it must show authority or ratification by the depositor."); *Tenark Constr. Corp. v. Great Am. Mortgage Investors,* 431 F.Supp. 863, 868 (W.D.La.1977) (holding that bank has duty to release fund only upon authorized signatures), *aff'd,* 566 F.2d 105 (5th Cir.1978).

■ To resolve this question, the Court must first interpret the power of attorney, which is a species of contract. "The determination of the legal effect of this written power [of attorney] is for the court." *McQuade v. Springfield Safe Deposit & Trust Co.,* 333 Mass. 229, 233, 129 N.E.2d 923, 925 (1955) (citations omitted). In most respects, a power of attorney is interpreted in the same manner as any other contract. The Court must put itself "in the place of the parties to the instrument and give its words their plain and ordinary meaning in the light of the circumstances and in view of the subject matter." *Id.* A contract must be interpreted as a whole and effect must be given to all of its provisions in order to effectuate its overall purpose. *See J.A. Sullivan Corp. v. Commonwealth,* 397 Mass. 789, 795, 494 N.E.2d 374, 378 (1986). In interpreting a contract, the court "must give effect to the parties' intentions and construe the language to give it reasonable meaning wherever possible." *Shea v. Bay State Gas Co.,* 383 Mass. 218, 224–25, 418 N.E.2d 597 (1981) (citations omitted). A power of attorney is subject to a special rule of construction that requires that

it be strictly construed to limit authority. *McQuade,* 333 Mass. at 233, 129 N.E.2d at 926; *Gagnon v. Coombs,* 39 Mass.App.Ct. 144, 158, 654 N.E.2d 54, 63 (1995); Restatement (Second) of Agency § 34 comment h. However, the rule of strict construction "does not go to the extent of destroying the purpose of the power. Authority to conduct a transaction includes authority to do acts which are incidental to it, or are reasonably necessary to accomplish it." *McQuade,* 333 Mass. at 233, 129 N.E.2d at 926.

■ Turning to the power of attorney at issue here, the Court construes it as creating only a limited authority for Epstein to operate the plaintiffs' Bank of Boston accounts. Although the first paragraph describes a general authority to operate the accounts, the second paragraph limits this authority by requiring a minimum balance of cash, invoices and/or prime bank instruments. This second limiting paragraph, like the first, is directed to the Bank. The document is addressed "To: Bank of Boston." The use of the word "account" in the second paragraph refers to the Bank of Boston account and not the plaintiffs, account with the Kinder Program. And, finally, the attorney's signature at the bottom of the document is presented as a "specimen" signature for the operation of the Bank account, not the Kinder account. Consequently, the most reasonable reading of the power of attorney as a whole is that both paragraphs describe and limit Epstein's authority to operate the Bank of Boston accounts.

In addition, construing the power in this manner is consistent with the special rules for strictly construing powers of attorney. *McQuade,* 333 Mass. at 233, 129 N.E.2d at 926. Strict construction requires the Court to give full effect to the second, limiting paragraph of the power of attorney. Interpreting the power of attorney in this manner is also consistent with the purpose of the power, which is to operate a "trading" account for prime bank instruments.

■ This conclusion does not require the Court to impose a fiduciary duty on the Bank, as the Bank argues. Specifically, the Bank claims that it can be held liable for

Epstein's withdrawals only if it agreed to take on the duties of a trustee or bailee under the terms of a special deposit, a special relationship, or an express agreement to act in a fiduciary capacity, none of which exist here.

The Bank is correct that in an ordinary debtor-creditor relationship, like the one here, a bank does not owe its depositors a fiduciary duty. *Flaherty v. Baybank Merrimack Valley*, 808 F.Supp. 55, 64 (D.Mass. 1992); *National Shawmut Bank v. Hallett*, 322 Mass. 596, 602, 78 N.E.2d 624, 628 (1948). If these were "special" accounts, the depositor would retain title to its money and could require the Bank to monitor the account to ensure that the funds were applied only to the particular purposes intended by the depositor. *South Central Livestock Dealers, Inc. v. Security State Bank*, 551 F.2d 1346, 1348–49 (5th Cir.1977). The plaintiffs acknowledge that they are only entitled to the protection afforded general depositors, but argue that this contractual protection is sufficient to hold the Bank liable for Epstein's unauthorized withdrawals. The Court concludes that the plaintiffs are correct.[11]

"[I]n Massachusetts, the law is settled that 'one who deals with an agent with knowledge of his limited powers does so at his peril.'" *Eastern Renovating Corp. v. Forhan*, 391 F.Supp. 204, 205 (D.Mass.1975) (quoting *McCarthy v. Parker*, 243 Mass. 465, 468, 138 N.E. 8, 9 (1923)); *see also Cauman v. American Credit Indem. Co.*, 229 Mass. 278, 283, 118 N.E. 259, 260 (1918); *Howard v. Barnstable County Nat'l Bank of Hyannis*, 291 Mass. 131, 137, 197 N.E. 40, 43 (1935). A principal with knowledge that an agent is exceeding the bounds of its powers is liable for its transactions with that agent. *See Michelin Tires (Canada) Ltd. v. First Nat'l Bank of Boston*, 666 F.2d 673, 680 (1st Cir. 1981); *First Nat'l Bank of Paulding County v. Cooper*, 252 Ga. 215, 312 S.E.2d 607, 608–09 (1984); *Dockstader v. Brown*, 204 S.W.2d 352, 358–59 (Ct.App.Tex.1947). *Michie on Banks and Banking* describes this rule as follows:

> It is generally held that where an agent draws checks on his principal's account, payable to himself, and deposits them to his own account, the mere form of the transaction, in the absence of additional circumstances, is not sufficient to put depositing bank on notice of the agent's fraud. If knowledge comes to the bank that an agent who is allowed to check upon the funds of a principal on deposit with it is about to commit a breach of trust in drawing checks upon the fund in bank, in such event, it would be the duty of the bank to protect the rights of the principal; but to acquire the knowledge, such bank will not be required to assert itself beyond the channels of its business. To hold a bank to a higher duty than that of being bound within the channels of its business in acquiring information of any projected breach of trust by an agent who has the power to check upon the funds of the principal in the bank would imperil the banking interests of the country. Where a principal is the depositor, and occupies a contractual relation to the bank, but an agent is given authority to draw checks against the deposit for the benefit of the principal or his business, the bank is not authorized to pay checks drawn by the agent for his own benefit if it know, or, it is sometimes said, if it have good reason to know, the fact.

5A *Michie on Banks and Banking* § 72, at 301–02.

Although the Court has not identified any Massachusetts cases directly on point, in the context of Mass.Gen.L. ch. 106, § 1–201(25), the First Circuit has held that "under Massachusetts law, a person has notice of a fact when, from all the information at his disposal, he has reason to know of it." *Michelin*, 666 F.2d at 682. The Court concludes that this standard is helpful here.

The undisputed facts here indicate that the Bank knew, through its normal "channels of business," that Epstein was exceeding the

---

11. Because the Court finds that the Bank is liable because it could not rely on the power of attorney, it need not reach Upclass' further argument that the Bank's action violated its instruction that withdrawals be permitted only upon authorization of two signatories to the account.

scope of his authority because the account balances indicated that he was withdrawing cash without replacing it with prime bank instruments or invoices with an equivalent face value. This conclusion is inescapable. The Bank acknowledges that it relied on the power of attorney to authorize Epstein's withdrawals. However, this same power of attorney stated unambiguously that Epstein was required to keep a minimum balance in the Bank of Boston account no less than the initial deposit in some combination of cash, prime bank instruments, or invoices for prime bank instruments. Furthermore, the Bank also acknowledges that it routinely checks the balance of an account before allowing any withdrawal. Therefore, the Bank had notice that the limitations of the power of attorney were being exceeded each and every time Epstein made a withdrawal pursuant to Kinder's power of attorney. This knowledge makes the Bank liable for Epstein's unauthorized withdrawals even in the absence of a fiduciary duty to "police" the account.

The Bank argues that it had no contractual duty to determine whether Epstein was acting within the scope of the limited power of attorney. The Bank urges the Court to follow the lead of other courts which have been hesitant to impose a duty on a bank to monitor an agent's performance of a limited authority. *Michelin*, 666 F.2d at 682; 5A *Michie on Banks and Banking* § 72, at 301 (arguing that to hold a bank to a duty to investigate an agent's activities outside the normal channels of the bank's business would "imperil the banking interests of the country"). For example, in *Crosby v. Loudoun National Bank*, 235 F.2d 540 (4th Cir.1956), the Fourth Circuit held that a bank was not liable for an agent who failed to purchase cattle with a note. The power of attorney authorized the agent to "execute notes, contracts or deeds of trust securing said notes for the purchase of live stock, cattle, cows, hogs, etc." *Id.* at 541. The court reasoned that because the power of attorney did not require the notes to be secured by a deed of trust, the bank could not be expected to control the agent; that is, to go out to the ranch and count cows.

In contrast, in this case the withdrawals from the plaintiffs' account were to be "secured" by invoices .or prime bank instruments, and the Bank was privy to all relevant documents in the transactions in the course of its usual business. The Bank could easily monitor the use (or misuse) of the power simply by noting the balance of the account, its normal procedure. Consequently, this is a very different set of circumstances than those at issue in *Crosby*. Therefore, the Court need not hesitate to hold the Bank liable for its part in a transaction wholly within its knowledge and control. *Cf. Fierst v. Commonwealth Land Title Co.*, 499 Pa. 68, 451 A.2d 674 (1982) (holding that a third party with notice of an agent's limitation, which was contained in the mortgage, could not subject the principal to liability for a transaction inconsistent with the limitation); *accord Texas Commerce Bank–Hurst v. United States*, 703 F.Supp. 592, 594 (N.D.Tex.1988) (holding that even in the debtor-creditor contractual relationship created by a general deposit, a bank has a duty to follow the depositor's instructions as set forth in its power of attorney).

In sum, a Court should ordinarily not require a Bank to monitor an agent's authority because in most circumstances this would require an investigation outside the confines of the banking transaction. However, where, as here, a bank can easily ascertain whether an agent is exceeding his authority on the face of documents necessary to the transaction, it will be liable for the unauthorized transactions. Accordingly, the Court rejects the Bank's argument that it is being wrongly held to a fiduciary duty.

 Nor does this holding require the Bank to become a "guarantor" of Epstein's performance, a duty it cannot be required to perform because to do so would constitute an *ultra vires* act. A national bank cannot agree to act as a guarantor of another without permission from its board of directors. *See, e.g., Farmers' & Miners' Bank v. Bluefield Nat'l Bank*, 11 F.2d 83, 83 (4th Cir. 1926); *Barron v. McKinnon*, 179 F. 759, 761 (C.C.D.Mass.1910). The Bank did not obtain the permission of its board prior to accepting the Kinder power of attorney and the plain-

tiffs' deposits. However, its contractual duty still did not constitute an *ultra vires* act because it was not required by the power of attorney to guarantee Epstein's performance. Instead, the Bank was required only to deal with Epstein within the limits of the power of attorney, and Epstein could have done nothing and the Bank would not be held liable for his failure to perform as his guarantor. Accordingly, the Court finds this argument to be flawed.

■ Nor is the Court persuaded by the Bank's argument that it could not breach an agreement with the plaintiffs because their checking accounts were incapable of holding securities, even assuming that prime bank instruments exist. Assuming for the sake of argument that the Bank's characterization of these accounts in correct, the Bank could still not decide to ignore the limitations on the power and give Epstein *carte blanche* access to plaintiffs' funds.

First, a bank has a duty to follow all of its depositors' instructions after accepting a deposit. *Mohan,* 313 Mass. at 310, 47 N.E.2d at 291–92. If the Bank could not deposit prime bank instruments in the accounts, it should have either informed the plaintiffs of the problem and assisted them in opening an appropriate account or refused Epstein's attempts to withdraw funds as contrary to the procedures set forth in the power of attorney. *Cf. Bank IV, Olathe,* 828 P.2d at 362. Nothing in the power of attorney permitted the Bank to allow a withdrawal without a corresponding deposit, and the alleged impossibility does not justify the unauthorized withdrawals.

For these reasons, the Court concludes that Kinder's power of attorney granted only limited authority to Epstein to operate the plaintiffs' Bank of Boston accounts, and that the Bank is liable for a violation of 4A because Epstein's withdrawals were not authorized by the account holders.

### 2. The Plaintiffs' Accounts

Having decided that the Kinder power of attorney became part of an implied contract for the handling of the plaintiffs' accounts, and that this power was only a limited au-

thority, the Court turns its attention to the disposition of the article 4A claim for each of the plaintiffs' accounts.

### a) The Blesch, Wurdig, Grabowski, Wellauer, Weber and Lonneman, Accounts

The Court allows the Grabowski plaintiffs' (except Huber's) motion for summary judgment on Count XII of their third amended complaint and Count XII of Friona's amended complaint, both asserting claims under 4A of the Uniform Commercial Code, because an implied contract existed between the plaintiffs and the Bank that Epstein's withdrawals would be in accordance with the limits of the power of attorney.

Kinder's power of attorney was presented to the Bank at the time their accounts were opened, and the Bank, with the exception of Huber, did not request that the account holders complete a form power of attorney that would have conferred on Epstein a general authority to operate the accounts. Nor did the Bank explain that checking accounts, which it contends cannot hold securities, could not be used in the manner set forth in the power of attorney as a trading account. Instead, the Bank accepted the powers of attorney, opened the accounts, and later deposited the plaintiffs' funds. Under Massachusetts law, these acts were sufficient as a matter of law to create an implied contract to operate the accounts in accordance with the power of attorney.

The Bank's motion for summary judgment on the plaintiffs' article 4A claims against these plaintiffs is denied.

### b) Huber/Corby Account

■ The Court allows Huber's motion for summary judgment on Count XII as to Epstein's withdrawals before September 24, 1993. Construing the disputed facts in the Bank's favor, the Court must assume that the Bank had in its possession a Kinder power of attorney executed by Corby before Epstein made his $3.41 million withdrawal and a power of attorney executed by Huber and backdated to that date that ratified his transaction. However, as noted above, these powers of attorney do not provide the Bank

with a defense because they created an implied contract to administer the accounts in accordance with their procedures.

It is undisputed that on September 24, 1993, Huber and Corby completed a general power of attorney provided by the Bank. Consequently, Epstein's transactions on or after September 24, 1993, were authorized. Because Huber and Corby granted Epstein general authority over their account, they could no longer hold the Bank liable for Epstein's withdrawals. As there is no dispute that Epstein was the person to whom plaintiffs were granting the power of attorney, the fact that Epstein as attorney in fact had not signed these documents is not material to this dispute. *McQuade*, 333 Mass. at 233, 129 N.E.2d at 925 (holding that the absence of attorney's signature does not invalidate a power of attorney). Accordingly, the Court allows the Bank's motion for summary judgment against Huber/Corby on Count XII for Epstein's transactions on or after September 24, 1993.

### c) Upclass Account

The Upclass plaintiffs argue that Epstein's withdrawals were unauthorized because they did not meet the account's two signature requirement. However, the Court agrees with the Bank that even if such a requirement existed, it would not have prevented these transactions because the Kinder power of attorney also executed by the account holders gave Epstein authority to operate the account without the constraint of a two signature requirement, although it limited the operation of the account in other ways. Nonetheless, the plaintiffs prevail on their article 4A claim because, like the other plaintiffs in the suit, they created an implied contract with the Bank to operate their account in accordance with the Kinder power of attorney, which the Bank failed to do. For this reason, the Court allows Upclass' motion for summary judgment on Count XII for a violation of article 4A, and denies the Bank's cross-motion against Upclass on this same count.

### II. CLAIMS OF DECEIT

Plaintiffs have presented no evidence to support a claim that the Bank made fraudulent misrepresentations of material fact to induce any of the plaintiffs to act. At best, plaintiffs present evidence of employee negligence in failing to read the terms of the power of attorney carefully and follow standard bank procedures. Mere negligence or breach of contract does not a Chapter 93A claim make. Accordingly, summary judgment is *ALLOWED* on Count VI of the Friona Amended Complaint. As the claim pursuant to Mass.G.L. ch. 93A hinges on the deceit claim, Count XI must also be dismissed.

### CONCLUSION

Because the Court has determined that the Bank is liable for a violation of article 4A, it need not reach the merits of the remainder of plaintiffs' claims.

### ORDER

Based on the foregoing, the Court orders as follows:

1. The Court *ALLOWS* the motion for summary judgment by plaintiffs Friona Ltd. and Weber (Docket No. 137) as to Count XII of the Amended Complaint for a violation of article 4A.

2. The Court *ALLOWS* the motion for summary judgment by plaintiffs Grabowski, Blesch, Corby, Wurdig and Kriesl (Docket Nos. 153–156) for Count XII of the Third Amended Complaint for a violation of article 4A, except with respect to the Huber/Corby account as described in paragraph 3 below.

3. The Court *ALLOWS* the motion for summary judgment by plaintiff Huber (Docket No. 67) for Count XII of the Third Amended Complaint for a violation of article 4A as to withdrawals made prior to September 24, 1993, and *DENIES* the motion as to withdrawals on or after September 24, 1993.

4. The Court *ALLOW* the cross-motion for summary judgment by defendant Bank of Boston (Docket Nos. 197, 47) for Count XII of the Third Amended Complaint for a violation of article 4A

as to the Huber/Corby account withdrawals made on or after September 24, 1993, and *DENIES* the motion as to withdrawals prior to September 24, 1993.

5. The Court *ALLOWS* the motion for summary judgment by plaintiff Upclass (Docket No. 177) for Count XII of the Third Amended Complaint for a violation of article 4A.

6. The Court *ALLOWS* the Bank's cross-motion for summary judgment on Count VI (Deceit) and Count XI (Ch. 93A) of Friona's amended complaint.