**Tomaz Mendes REGATOS, Plaintiff,**

v.

**NORTH FORK BANK and New Commercial Bank of New York, Defendants.**

**No. 02 Civ. 1068(SAS).**

United States District Court, S.D. New York.

March 21, 2003.

**634**

Eduardo Lopez, Lopez & Romero, New York, New York, for Plaintiff.

Eric J. Bressler, Wickham, Wickham & Bressler, P.C., Mattituck, New York, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

Tomaz Mendes Regatos, a citizen of Brazil, is suing the Commercial Bank of New York[1] and North Fork Bank as its successor-in-interest[2] (collectively, "CBNY" or the "Bank"), seeking reimbursement in the amount of $600,000 for two allegedly unauthorized wire transfers out of his account. The Bank now moves for summary judgment under Federal Rule of Civil Procedure 56, claiming that

---

1. In 2001, the Commercial Bank of New York changed its name to New Commercial Bank of New York. *See* Amended Complaint ("Am. Compl."), Ex. A to the Affidavit of Nelson Badillo, Vice President of North Fork Bank and former Vice President of Commercial Bank of New York ("Badillo Aff."), ¶ 7.

2. Plaintiff has alleged that on November 9, 2001, Commercial Bank of New York became a wholly-owned subsidary of North Fork Bank, which resulted in North Fork's assumption of its liabilities. *See* Am. Compl. ¶ 4.

Regatos is estopped from seeking reimbursement because he failed to comply with the notice provision of an agreement between the parties. This case presents an important question of first impression: whether the one year period to object to an erroneous funds transfer provided for in Article 4–A of the Uniform Commercial Code may be shortened by agreement.

## I. FACTS

The following facts are undisputed, or where disputed, presented in the light most favorable to Regatos, the non-moving party.[3]

On July 11, 1997, Regatos opened a deposit account with CBNY in his name and the names of his wife and daughter. *See* Application, attached to Def. 56.1 Stmt. The Account Agreement accompanying the application, which Regatos signed *on* the bottom of each page, includes the following language:

> The Bank will, unless the depositor has authorized to the contrary, send to the depositor at his address of record not less frequently than quarterly, a statement of accounts accompanied, when applicable, by items paid in support of the debit entries on such statement. *The depositor will exercise reasonable care and promptness in examining such statement and items to discover any irregularity including, but not limited to, any unauthorized signature or alteration and will notify the Bank promptly*

*in writing of any such discovery, and in no event more than fifteen (15) calendar days subsequent to the time that such statement and items were first mailed or available to the depositor.* In those situations in which the depositor has authorized the Bank to hold his correspondence, this section shall apply as if the depositor received such statement on the date shown on the statement. . . .

Account Agreement, Terms and Conditions, attached to Def. 56.1 Stmt., ¶ 8 (emphasis added).

In addition to the Account Agreement, the Bank contends that Regatos agreed to an additional form, entitled "Account Information," in which Regatos gave CBNY consent to hold his bank statements, rather than mail each one to him. Unlike the Account Agreement, Regatos never signed this form and claims that he has never seen it. *See* Affidavit of Tomaz Mendes Regatos ("Regatos Aff."), Ex. 2 to Appendix to Plaintiff's Contentions of Disputed Facts ("Pl.App."), ¶ 5 ("Not only is my signature missing from that page, but also no part of the page is in my handwriting. Evidently this page is an additional form that was filled out by a bank employee after the agreement was signed.").

Regatos admits, however, that he had a conversation with Joao Almada, a director of CBNY, in which Almada informed Regatos that he would be provided with documents related to his account *only* upon request. *See* Deposition of Tomaz Mendes Regatos ("Regatos Dep."), Ex. C to the

---

**3.** The Bank argues that its Rule 56.1 statement ("Def. 56.1 Stmt.") should be deemed admitted because, rather than formally opposing the Bank's Rule 56.1 statement, Regatos submitted his own "Contention of Undisputed Facts." As I informed the parties during a March 6, 2003, telephone conference, Regatos' earlier response to the Bank's proposed Rule 56.1 statement, coupled with his Appendix to Plaintiff's Contentions of Disputed Facts, are a sufficient response.

The Bank also argues that Regatos' Contention of Undisputed Facts should be disregarded because he is not a moving party. There is no reason to disregard this document. Regatos' submission points to admissible evidence in the record that may be helpful in resolving this motion. However, the Bank is not required to respond under Rule 56.1(b), and none of Regatos' assertions are deemed admitted under Rule 56.1(c), because there is no cross-motion.

Badillo Aff., at 10–11. Regatos claims that, at the time he opened the account, Almada informed him that it was CBNY's practice to retain the monthly account statements of its Brazilian customers. *See* Regatos Aff. ¶ 5. Regatos admits that he requested and received bank extracts on a monthly basis in 1997, and as needed in 1998, 1999, 2000 and 2001. *See* Regatos Dep. at 11–12. In 2001, Regatos requested the bank extract only two or three times, once or twice in January, February or March and once on August 9. *See id.* at 13.[4]

Pursuant to the Account Agreement, Regatos was permitted to make wire transfers out of his New York CBNY account from his home in Brazil without ever dealing directly with the New York office. *See* Affidavit of Rachelle Abadi ("Abadi Aff.").[5] Regatos described the procedure he used to effectuate such transfers as follows. First, Regatos would sign a payment order form and fax it to the CBNY representative office in Sao Paulo, Brazil. *See* Regatos Dep. at 43–44. He would then follow up with a phone call to Abadi, confirming that she had received the fax. *See id.* at 44. In the rare instances when Regatos would not call right away, Abadi would call him on his cell phone to confirm. *See id.* Regardless of who initiated the phone call, Regatos would then verbally approve the amount of the payment order and authorize Abadi to execute the transaction. *See id.* After receiving confirma-

tion, Abadi would fax the payment order form to the New York office. In New York, a CBNY employee would check the signature on the faxed payment order against Regatos' signature card, which the Bank kept on file. *See* Abadi Aff. ¶ 2; *see also* Deposition of Nelson Badillo ("Badillo Dep.") at 37.[6] This procedure—sending a facsimile followed by a call-back—was instituted by Regatos. *See* Badillo Dep. at 45. CBNY did not provide Regatos with a password or algorithm for purposes of identification. *See id.*

The procedure used by Regatos was confirmed by Abadi. In her affidavit, Abadi stated that

> [t]he Sao Paulo office regularly followed the practice of not forwarding a customer's payment order facsimile to New York unless there was telephonic confirmation in Sao Paulo that the customer had in fact sent the facsimile payment order. This confirmation could be in a telephone call by the customer to the Sao Paulo office or by a call from the office to the customer. In the case of a payment order sent to the Sao Paulo office by Mr. Regatos, after following such steps, I would countersign the order, assign an order number and forward it to CBNY in New York for processing.

Abadi Aff. ¶ 5.

On March 23, 2001, $450,000 was wired out of Regatos' CBNY account to Citibank

---

4. At all relevant times to this dispute, CBNY's policy was to *not* send a separate funds transfer notice (as opposed to a periodic account statement) unless specifically requested by the customer. Although this policy was in effect regardless of whether a customer had a "hold mail" agreement, the effect was that unless otherwise requested, *no* customer would receive notice of funds transfers until, at the earliest, receipt of their periodic account statement.

5. Abadi was the employee in the Sao Paulo office who dealt with Regatos at all times relevant to the instant dispute. Abadi is also sometimes referred to in Regatos' deposition as "Dona Shella."

6. Because Regatos faxed his order to the Sao Paulo office, which forwarded it to the New York office, the CBNY employees in New York were forced to compare Regatos' signature card against a fax-of-a-fax. *See id.* The Sao Paulo office, however, did not have a signature card on file. *See id.*

New York.[7] *See* 3/23/01 Account Statement, attached to Def. 56.1 Stmt. On April 6, 2001, another $150,000 was wired to Citibank from Regatos' account. *See* 4/25/01 Account Statement, attached to Def. 56.1 Stmt. In both cases, the transfers represented more than half of the money in the account.

Regatos contends that he neither initiated nor authorized these transfers. *See* Regatos Dep. at 35. According to Regatos, the Sao Paulo office never called him to confirm the payment orders initiating these transfers, and he would not have authorized either transfer if he had been called. *See id.* According to the Bank, the payment orders in issue were authentic and the transfers were authorized. *See* Abadi Aff. ¶ 6 ("I do not remember originating the specific transactions here in issue, but I have examined the payment orders here in issue. They bear my signature and order numbers, and based on our office procedures I am certain that telephonic verification of these payment orders would have been received by the Sao Paulo office before dispatching them to New York."); Badillo Dep. at 63 (stating that the client's signature was the basis for the Bank's position that the transfers were authorized). Regatos notified CBNY of these allegedly improper transfers on August 9, 2001, almost five months after the first relevant account statement became available (and four months after the second became available), but on the *same day* that he received actual notice of the transfers. *See* Def. 56.1 Stmt. ¶ 5.

7. It is unclear whether the beneficiary of the wire transfer was actually Citibank, or an unnamed party who had an account at Citibank.

8. "An issue of fact is genuine 'if the evidence is such that a jury could return a verdict for the nonmoving party,'" *Gayle v. Gonyea,* 313

## II. SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002).[8]

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *See Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 286 (2d Cir.2002) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, she "'must do more than simply show that there is some metaphysical doubt as to the material facts,'" *Caldarola,* 298 F.3d at 160 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)), and she "'may not rely on conclusory allegations or unsubstantiated speculation.'" *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.), *cert. denied,* 534 U.S. 891, 122 S.Ct. 206, 151 L.Ed.2d 146 (2001) (quoting *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998)). *See also Gayle,* 313 F.3d at 682. Rather, the non-moving party must produce significant ad-

F.3d 677, 682 (2d Cir.2002) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)), and a fact is material when "it 'might affect the outcome of the suit under the governing law,'" *id.* (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

missible evidence that supports her pleadings. *See First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). In this regard, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir.2003) (quoting *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505).

In determining whether a genuine issue of material facts exists, the court is to construe the evidence in the light most favorable to the non-moving party and draw all inferences in that party's favor. *See Niagara Mohawk*, 315 F.3d at 175. Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. Summary judgment is therefore inappropriate "if there is *any* evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel*, 310 F.3d at 286 (emphasis added) (citing *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir.2000)).

## III. DISCUSSION

In support of its motion for summary judgment, the Bank advances only one argument: that Regatos' failure to object to the wire transfers within fifteen days of the issuance of the statements reflecting them, as required by the Account Agreement, estops him from asserting this claim. In response, Regatos argues that (1) because he never agreed to the provisions instructing the Bank to hold his mail, he was denied notice of the transfers; (2) that even if he did agree to the hold mail order, the fifteen day notice period is unenforceable, and (3) that even if the fifteen day notice period is enforceable, the Bank did not act with ordinary care in making the transfers.

### A. Article 4–A of the Uniform Commercial Code Controls Wire Transfers

■ As an initial matter, the parties disagree over which section of New York's Uniform Commercial Code ("UCC") governs the instant dispute. Regatos urges the application of Article 4 (entitled "Bank Deposits and Collections"), while the Bank argues that Article 4–A ("Funds Transfers") applies.[9] The Bank is correct.

Article 4–A "applies to funds transfers defined in Section 4–A–104," unless those funds transfers are governed by the Electronic Fund Transfer Act of 1978, 15 U.S.C. § 1693 *et seq.* ("EFTA"). N.Y. U.C.C. § 4–A–102.[10] Section 4–A–104 defines "funds transfers" as:

9. Article 4 and Article 4A are entirely segregated sections of the UCC; Article 4A is not a subpart of Article 4.

10. The EFTA governs wire transfers to and from bank accounts "established primarily for personal, family, or household purposes," 15 U.S.C. § 1693a(2); *see also* 12 C.F.R. § 205.2(b)(1), and its provisions are generally more consumer-friendly. Regatos, however, has admitted that the purpose of the account in question was purely commercial, making the EFTA inapplicable. *See* Regatos Aff. ¶ 2 ("For a number of years I worked with Andrade Gutierrez Empreendimentos Ltda., a large and long-established Brazilian construction firm carrying out international building projects. This work involved certain projects for the government of Angola. During the time of my involvement, Andrade Gutierrez was carrying out extensive construction in Angola and, since I had prior extensive experience working in that country, I was considered the appropriate party to deal and negotiate with the Angolan government on behalf of the company. *The funds in my account at Commercial Bank of New York (CBNY) that is the subject of this lawsuit dealt with Andrade Gutierrez construction in Angola.*") (emphasis

the series of transactions, *beginning with the originator's payment order,* made for the purpose of making payment to the beneficiary of the order. The term ["funds transfers"] includes any payment order issued by the originator's bank or an intermediary bank intended to carry out the originator's payment order. A funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's payment order.

N.Y. U.C.C. § 4–A–104 (2003) (emphasis added). The "originator" is "the sender of the first payment order in a funds transfer." *Id.*[11]

This type of transfer is exactly what is involved here. The Bank alleges that Regatos—the originator—faxed the payment orders to CBNY's representative office in Sao Paulo for the purpose of making payments from his New York account at CBNY to Citibank (or an account holder at Citibank), the beneficiary. In fact, this case is identical to the example given as "Case # 2" in the Official Comment to section 4–A–104.[12] *See generally Sheerbonnet, Ltd. v. American Express Bank, Ltd.,* 951 F.Supp. 403, 406-09 (S.D.N.Y. 1996) (discussing scope of Article 4–A).[13]

added); *see also id.* ¶ 15 ("At the time the account at CBNY was created, my wife, Mariza Mayer Regatos and my daughter, Melissa Mayer Regatos, were named as additional signatories. However, they never used the account.").

11. Regatos' argument that Article 4A applies only to "the electronic transfers themselves, not the documents or procedures used to carry them out," and in any case applies only to "fund transfer rules as between banks," Pl. Mem. at 3–4, is thus unavailing. Article 4A covers funds transfers "beginning with the originator's payment order" and ending when the beneficiary's bank accepts the corresponding payment order. N.Y. U.C.C. § 4–A–104.

12. Case # 2 describes a scenario in which X, who has an account in Bank A, instructs that bank to pay $1,000,000 to Y's account in Bank B.

With respect to this payment order, X is the sender, Y is the beneficiary, and Bank A is the receiving bank. Bank A carries out X's order by instructing Bank B to pay $1,000,000 to Y's account. This instruction is a payment order in which Bank A is the sender, Bank B is the receiving bank, and Y is the beneficiary. When Bank A issued its payment order to Bank B, Bank A "executed" X's order. In the funds transfer, X is the originator, Bank A is the originator's bank, and Bank B is the beneficiary's bank. When Bank A executed X's order, X incurred an obligation to pay Bank A the amount of the order. When Bank B ac-

cepts the payment order issued to it by Bank A, Bank B incurs an obligation to Y to pay the amount of the order and Bank A incurs an obligation to pay Bank B. Acceptance by Bank B also results in payment of $1,000,000 by X to Y. In this case, two payment orders are involved in the funds transfer.

N.Y. U.C.C. § 4–A–104, Official Comment. In the instant case, X is Regatos, Bank A is CBNY, Bank B is Citibank New York, and Y is the ultimate recipient of the transfer, an unidentified person or entity here.

13. If that were not enough, Article 4–A explicitly and exclusively governs wire transfers.

In the drafting of Article 4A, a deliberate decision was made to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment. A deliberate decision was also made to use precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability, rather than to rely on broadly stated, flexible principles.

The rules that emerged represent a careful and delicate balancing of those interests and are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and lia-

## B. The Statutory Framework

This case requires the resolution of an important and difficult tension that exists among various provisions of Article 4A. Before that tension can be resolved, however, it is important to understand the statutory framework.

### 1. The UCC Generally

■ The Uniform Commercial Code was enacted in New York in 1962 with three overarching goals in mind: "(a) to simplify, clarify and modernize the law governing commercial transactions; (b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties; and (c) to make uniform the law among the varying jurisdictions." N.Y. U.C.C. § 1–102(2). Whenever possible, the UCC should be interpreted liberally to promote these goals. *Id.* § 1–102(1).

■ At the same time, the drafters of the UCC recognized that broad rules governing commercial transactions were unlikely to meet the needs of all parties. Thus, "freedom of contract is a principle of the Code." *Id.* § 1–102, Official Comment 2.

> The effect of provisions of this Act may be varied by agreement, except as otherwise provided in this Act and except that the obligations of good faith, diligence, reasonableness and care prescribed by this Act may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.

*Id.* § 1–102(3). This dedication to freedom of contract is repeated in the context of Article 4A:

> Except as otherwise provided in this Article, the rights and obligations of a party to a funds transfer may be varied by agreement of the affected party.

*Id.* § 4–A–501(1). Unless the statute designates a provision as one that may not be varied by agreement, the agreement of the parties will trump the provisions of the UCC. In that sense, "[i]n an electronic funds transfer case an agreement between the parties may be the most significant source of law in the entire transaction." 3 James J. White & Robert S. Summers, *Uniform Commercial Code* § 22–3 (4th ed.1995).

### 2. Liability Under Article 4A

The default rule of the UCC is that the bank will bear the loss of any unauthorized funds transfer. *See* N.Y. U.C.C. §§ 4–A–202(1), 4–A–204(1).[14] That rule is subject to a broad exception when the bank and its customer agree on a "security procedure" to ensure that payment orders received by the bank are authorized and error-free. *See id.* §§ 4–A–202(2), 4–A–204(1). Specifically, if such a security procedure is in place, the loss from an unauthorized funds transfer will be shifted to the customer when (1) the security procedure is commercially reasonable, and (2) the bank accepted the payment order (i) in good faith and (ii) in compliance with the security

---

bilities inconsistent with those stated in this Article.
N.Y. U.C.C. § 4–A–102, Official Comment. Indeed, the UCC "was inapplicable to wire transfers prior to the enactment of Article 4–A." *Weeks Office Prods., Inc. v. Chemical Bank,* 180 A.D.2d 419, 579 N.Y.S.2d 86, 86 (1st Dep't 1992).

14. A transaction is authorized by the sender "if [the person identified as sender] authorized the order or is otherwise bound by it under the law of agency." *Id.* § 4–A–202(1). An unauthorized payment order, conversely, is any order not initiated by the person identified as the sender or her agent. *See id.*

procedure. *See id.* §§ 4–A–202(2), 4–A–204(1). "[R]ights and obligations arising under this section ... may *not* be varied by agreement," *see id.* § 4–A–202(6) (emphasis added), except in certain ways that are not at issue here.[15]

A payment order accepted in good faith pursuant to a commercially reasonable security procedure is said to be "effective" as the order of the customer because it can be properly verified. *Id.* § 4–A–202(2). Such an order is effective even if it is actually unauthorized, as in the case of a perfect forgery.[16]

■ But where a payment order is not effective—or where a payment order is unauthorized and there is no security procedure in place—the bank has an *invariable* duty to refund the lost funds:

> (1) If a receiving bank accepts a payment order issued in the name of its customer as sender which is (a) not authorized and not effective as the order of the customer under Section 4–A–202, or (b) not enforceable, in whole or in part, against the customer under Section 4–A–203, the bank shall refund any payment of the payment order received from the customer to the extent the bank is not entitled to enforce payment and shall pay interest on the refundable

amount calculated from the date the bank received payment to the date of the refund. However, the customer *is not entitled to interest from the bank* on the amount to be refunded if the customer fails to exercise ordinary care to determine that the order was not authorized by the customer and to notify the bank of the relevant facts *within a reasonable time not exceeding ninety days* after the customer received notification from the bank that the order was accepted or that the customer's account was debited with respect to the order. *The bank is not entitled to any recovery from the customer on account of a failure by the customer to give notification as stated in this section.*

> (2) Reasonable time under subsection (1) may be fixed by agreement as stated in subsection (1) of Section 1–204, but the obligation of a receiving bank to refund payment as stated in subsection (1) *may not otherwise be varied by agreement.*

*Id.* § 4–A–204 (emphasis added). Under sections 4–A–202 and 4–A–204, therefore, the bank has an invariable duty to refund payment for a funds transfer that is not effective and unauthorized, even if the customer fails to give notification. The customer has an invariable right of refund.

---

**15.** The general liability rules of section 4–A–202 may be varied by agreement in two ways. *First,* a bank is not required to accept a payment order that violates a written agreement. *See id.* § 4–A–202(2). For example, the bank and its customer may have agreed that a funds transfer that creates an overdraft will not be accepted, or that the customer may only send funds transfers to certain listed beneficiaries. *Second,* a bank can be relieved of using a commercially reasonable security procedure without shouldering any loss if (a) the bank offered but the customer rejected a commercially reasonable security procedure, and (b) the customer agreed in writing to be bound by unauthorized or erroneous funds transfers. *See id.* § 4–A–202(3).

**16.** Section 4–A–203 provides two instances, however, where a customer will not be obliged to bear the loss of an unauthorized yet effective funds transfer: (1) where the parties specifically so agree; and (2) when the payment order was (i) not issued by the account holder or her agent; and (ii) not issued by someone who gained knowledge of the security procedure from the account holder or her agent. *See id.* § 4–A–203. The customer has the burden of proving that the second instance applies. When it does, however, Article 4A places the risk of so-called "interloper fraud" on the bank, rather than the customer.

The only impact of a failure to notify is the loss of interest on the amount wrongly transferred.

If the UCC said no more, this would be an easy case. When a funds transfer is executed in violation of a commercially reasonable security procedure, the bank must refund the amount wrongly transferred, no matter what. The only remaining questions would be factual: was there a commercially reasonable security procedure in place,[17] and did the Bank comply with it in executing the two transfers at issue.

However, Article 4A contains one last, somewhat vexing, relevant provision:

> If a receiving bank has received payment from its customer with respect to a payment order issued in the name of the customer as sender and accepted by the bank, and the customer received notification reasonably identifying the order, *the customer is precluded from asserting that the bank is not entitled to retain the payment unless the customer notifies the bank of the customer's objection to the payment within one year after the notification was received by the customer.*

*Id.* § 4–A–505 (emphasis added). Thus, a customer must notify her bank within one year of receiving notice of an unauthorized or erroneous funds transfer, or else she will lose the right to object.

### C. Regatos' Objection to the Transfers Was Timely

#### 1. The One Year Statute of Repose May Not Be Shortened by Agreement

■ Nothing in the statute explicitly prohibits the one year notice provision

from being varied by agreement. Read in isolation, a bank and its customer could agree that notification must be made within any period of time, including fifteen days. However, the one year notice provision strongly implicates the *invariable* right of refund provided by sections 4–A–202 and 4–A–204. Those sections explicitly state that an agreement cannot vary the duty of a bank to refund a transfer that was executed in derogation of the bank's duty to follow agreed-upon security procedures. Surely, a very short notice period would effectively eviscerate the absolute duty created by sections 4–A–202 and 4–A–204. Similarly, section 4–A–204 explicitly states that a customer's failure to give notice will not disturb her right to refund, and *that* provision may not be varied by agreement.

The Official Comments to section 4–A–505 evoke the invariable rights created in sections 4–A–202 and 4–A–204:

> This section [4–A–505] is in the nature of a statute of repose for objecting to debits made to the customer's account. A receiving bank that executes payment orders of a customer may have received payment from the customer by debiting the customer's account with respect to a payment order that the customer was not required to pay. For example, the payment order may not have been authorized or verified pursuant to § 4–A–202 or the funds transfer may not have been completed. In either case the receiving bank is obliged to refund the payment to the customer and this obligation to refund payment cannot be varied by agreement. [*See*] Section 4A–204 and § 4A–202.... Under 4A–505, however, the obligation to refund may not be asserted by the customer if the

---

**17.** As discussed *infra,* whether a security procedure is commercially reasonable is a question of law to be decided by the Court. However, the Court's determination will of course turn on the relevant facts.

customer had not objected to the debiting of the account within one year after the customer received notification of the debit.

*Id.* § 4–A–505, Official Comment. The Official Comment indicates that the drafters were cognizant of the interplay between the one year notice provision of section 4–A–505 and the duty to refund provisions of 4–A–202 and 4–A–204. But neither the statute nor the Official Comments discuss the ability to vary the one year notice provision by agreement without fundamentally disturbing the invariable refund provisions.

As Judge Loretta Preska of this Court observed five years after its passage, Article 4–A's "exact contours, its reach, and the implications of its various provisions have not yet been tested in state or federal courts." *Sheerbonnet,* 951 F.Supp. at 406. Seven years later, the same is true. While Article 4–A has been the subject of some litigation, no court has examined the interplay between the sections at issue here. Because neither the New York State legislature nor the drafters of the UCC have resolved this inconsistency, and because I cannot certify this question to the New York Court of Appeals, *see* N.Y. Ct.App. Rules of Practice § 500.17(a), I must decide, for the first time, whether, and to what extent, the one year notice provision may be altered by agreement.[18]

Lacking any other source of guidance, I look first to the general canon of construction contained in the UCC, namely to give

purpose to its underlying policies. With respect to Article 4A, those policies are clear.

The drafters of the UCC intended to fill a gap in the law. Prior to the enactment of Article 4A, the UCC did not cover funds transfers. *See Weeks Office Prods.,* 579 N.Y.S.2d at 86. Thus, the drafters wrote Article 4A on a "clean slate," intending to create a comprehensive body of law without reference to existing statutes or common law rules. *See* N.Y. U.C.C. § 4–A–102, Official Comment. Recognizing that funds transfers are inherently different from other commercial transactions, the provisions of Article 4A do not mirror the rest of the UCC. *See id.*

The drafters' aims are equally clear with respect to the unauthorized transfers of funds. They intended to encourage banks to implement security procedures for funds transfers. If no security procedure is in place, the customer has an absolute right to recover. If a security procedure *is* in place, and it is followed, the bank is absolved from loss. But if a security procedure is in place and the bank fails to follow it, that is as good as no security procedure at all: the loss reverts to the bank and the customer has an absolute right to recover. This allocation of loss is so integral to the structure of Article 4A that it may not be varied by contract.

The only time limits placed on the customer's right to recover are (a) one year for the customer to object to the unauthorized transfer, and (b) a "reasonable time"

---

**18.** The Bank asserts that "[t]here is no prohibition in Article 4–A against varying the time of required objection in § 4–A–505. Thus, the parties were free to agree to a shorter time period for notification than that provided in § 4–A–505." Def. Mem. at 2–3. In support of this proposition, the Bank cites only *New York Credit Men's Adjustment Bureau, Inc. v. Manufacturers Hanover Tr. Co.,* 41 A.D.2d 912, 343 N.Y.S.2d 538 (1st Dep't 1973). That

case, however, is totally inapposite because it does not deal with Article 4–A, which did not take effect until 1991. Similarly, both of the cases cited by Regatos discuss Article 4, not Article 4A, and are of no help here. *See Monreal v. Fleet Bank,* 95 N.Y.2d 204, 713 N.Y.S.2d 301, 735 N.E.2d 880 (2000); *Putnam Rolling Ladder Co. v. Manufacturers Hanover Tr. Co.* 74 N.Y.2d 340, 547 N.Y.S.2d 611, 546 N.E.2d 904 (1989).

limit, not to exceed ninety days, to object to the unauthorized transfer if the customer seeks interest on the lost funds. The reasonable time period may be defined by the parties, but otherwise the customer has one year to notify the bank.

Section 4–A–501 permits only "the *rights and obligations* of a party to a funds transfer [to] be varied by agreement." N.Y. U.C.C. § 4–A–501(1) (emphasis added). Section 4–A–505, however, prescribes neither the rights nor the obligations of a party to a funds transfer agreement, but rather sets a jurisdictional bar.[19] Section 4–A–505's one year limitation is in the nature of a statute of repose. *See id.* § 4–A–505, Official Comment. *See also Grabowski v. Bank of Boston*, 997 F.Supp. 111, 119 (D.Mass.1997) (interpreting identical section of Massachusetts' UCC).[20] In other sections of the UCC that provide statutes of repose, the legislature was careful to explicitly permit the time period to be varied by agreement. *Compare id.* § 4–A–505 *with id.* § 2–725 (explicitly authorizing parties in typical contract cases to change statute of limitations by agreement, so long as the limitations period is not decreased to less than one year). That the legislature did not do so in the case of Article 4A is strong evidence that it intended the one year period to be invariable.

Consideration of the structure of Article 4A, along with its underlying purpose and policies, leads to the conclusion that the drafters did not intend to permit a bank

and its customer to vary the one year notice period by agreement. Accordingly, the fifteen day notice period provided for in Regatos' Account Agreement is invalid as a matter of law.

### 2. A Fifteen Day Notice Provision Is Unreasonable

■ Even assuming, *arguendo*, that the parties could vary the one year notice provision, the fifteen day period would still be invalid. At the very least, the notice period to recover the transferred funds must be read consistently with the "reasonable time" period to receive interest. An agreement cannot fix an unreasonable notice period:

> Can the parties shorten the one-year provision of 4A–505 . . . to sixty days? If the parties were to do this by agreement and so reduce the right of the customer to recover an improper payment to sixty days after notice was received by the customer reasonably identifying the order, would this be a modification of the sender's right to a refund [under] . . . 4A–204 and thus violate 4A–204[2]?

> Put another way, 4A–505 operates after one year to preclude a request by the customer to recredit its account for an inappropriate charge because the order itself was not authorized or verified. The Comment to 4A–505 refers to the invariability of 4A–204. . . . *Section 4A–505 should not be interpreted to allow*

---

**19.** Section 4–A–505 is thus contained in Part 5 of Article 4A, entitled "Miscellaneous Provisions," instead of in Parts 3 and 4, which prescribe the substantive obligations and rights of parties to a funds transfer, including the money back guarantee provisions of Sections 4–A–202 and 4–A–204.

**20.** The Court in *Grabowski* differentiated section 4–A–505's "statute of repose" from a "statute of limitations." *See* 997 F.Supp. at

119. Of course, a statute of limitations *is* a statute of repose, *see Board of Regents of Univ. of the State of N.Y. v. Tomanio*, 446 U.S. 478, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980), but the broader term "statute of repose" indicates any statute that limits the ability of a litigant to prosecute an action. The *Grabowski* court simply meant that a customer need not *sue* within one year; it is sufficient if she "objects."

*what cannot be done by agreement under 4A–204.* ... Surely a one day cutoff would violate ... 4A–204[2]. What about six months or sixty days? We are sure that a one day period would fail; where the line should be drawn we are not sure, but we are skeptical of [a] 60–day rule....

3 White & Summers at 22 (emphasis added). *See also* Paul S. Turner, *The UCC Drafting Process and Six Questions About Article 4A: Is There a Need for Revisions to the Uniform Funds Transfers Law?*, 28 Loy. L.A. L.Rev. 351, 359 (1994) ("Question No. 1: Can the Statute of Repose Be Shortened by Agreement?").

Professors White and Summers zeroed in on the problem. Although I have held that the one year notice provision of section 4–A–505 may not be varied by agreement, even if it were variable, a fifteen day notice provision is demonstrably unreasonable and effectively guts the invariable rights of the customer under sections 4–A–202 and 4–A–204. This is especially true in light of the fact that Regatos' account statements were held by the Bank and only provided to him upon request.

The fifteen day notice requirement contained in the Account Agreement is therefore no impediment to Regatos' claims for reimbursement.

### 3. The Time to Object Is Triggered by Receipt of Actual Notice

■ The Bank's motion must be denied for yet another reason. Article 4A requires *actual notice* of a funds transfer before the duty to notify is invoked. *Compare* N.Y. U.C.C. § 4–A–204 (referring to a customer's duty to report unauthorized funds transfers with respect to "the date the customer *received* notification from the bank") *with id.* § 4–406 (referring to a customer's duty to report unauthorized checks with respect to "[w]hen a bank sends to its customer a statement of account ... *or holds the statement* and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer") (emphasis added). *See also id.* § 4–A–204, Official Comment 2 ("The customer has a duty to exercise ordinary care to determine that the order was unauthorized *after it has received notification from the bank.* ...."). The actual notice requirement is not variable by agreement. *See id.* § 4–A–204(b); *see also* Part III.C.1.

As noted earlier, the Bank failed to provide actual notice. In a letter to this Court dated March 18, 2002, the Bank conceded that it never provided separate notice of a bank transfer to its customers. Rather, such notice was provided only by notation in the periodic account statement (presumably monthly). But, Regatos' monthly statements were not sent to him. Rather, pursuant to a "hold mail" agreement to which Regatos lodged no objection during the four years that he had the account, the statements were only available at his request.[21] While a "held" account statement will start the clock running on the time to object to unauthorized checks, for example, *see* N.Y. U.C.C. § 4–406, it is clearly not sufficient to start the clock with respect to account transfers, which require *actual* notice. The Bank knew or should have known that the

---

**21.** While Regatos now asserts that he never agreed to such a procedure, that objection is waived by virtue of four years of practice. *See* N.Y. U.C.C. § 1–205 ("A course of dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expression and other conduct."). Thus, whether or not he signed the form permitting the Bank to "hold mail" he is precluded from repudiating that procedure.

phrase "receive[d] notification" in section 4A–204, required it to send notice of the transfer to the customer if it wanted to avail itself of any notice time limit. This obligation is not met by waiting for a customer to request a copy of his statement.

Regatos did not receive actual notice until he requested his account statement on August 9, 2001. He objected to the two wire transfers at issue here that same day. Thus, Regatos' notice was timely even under the terms of the Account Agreement because he objected within fifteen days of receipt of notification. Moreover, because he timely objected under the Account Agreement, Regatos is entitled to interest on the amount wrongly transferred, dating from the time of the transfers, if he prevails on his claims for reimbursement.

### D. There Is a Material Issue of Fact Regarding Whether the Wire Transfers Were Authorized by Regatos

Because Regatos' claim is timely, the only question remaining is whether the Bank is liable for the allegedly unauthorized wire transfers under sections 4–A–202 and 4–A–204. Three questions are relevant to that analysis: (1) did Regatos and CBNY have an agreement mandating the use of a security procedure; (2) was that procedure commercially reasonable; and (3) did CBNY accept the payment orders in compliance with that security procedure. This last question raises a triable issue of fact.

### 1. Regatos and the Bank Agreed on a Security Procedure

█ From 1997 to 2001, Regatos and the Bank adhered to a procedure that was used for every wire transfer. Both Regatos and agents of the Bank agreed on the mechanics of that procedure: Regatos

would send a fax, and then call to follow-up. The New York office of CBNY would then compare the signature on the faxed order to a signature card on file. Regardless of whether there was an explicit agreement, this unvaried course of conduct over a period of four years evinces a clear understanding among the parties: they agreed on a security procedure.

### 2. The Agreed–Upon Security Procedure Was Commercially Reasonable

█ Whether a particular security procedure is commercially reasonable is a question of law for the Court to decide. *See* N.Y. U.C.C. § 4–A–202(3); *Banque Worms v. BankAmerica Int'l,* 77 N.Y.2d 362, 568 N.Y.S.2d 541, 549 n. 9, 570 N.E.2d 189 (1991). In this case, the security procedure had three elements: a signed order, a confirmatory phone call (always between Regatos and Abadi), and a signature comparison.

█ Although comparison of a signature on a payment order to a signature card on file is not by itself a security procedure, *see* N.Y. U.C.C. § 4–A–201, the signature comparison coupled with the other elements of the security procedure render it commercially reasonable. In particular, the use of a confirmatory phone call placed to the same Sao Paulo representative, who presumably could recognize Regatos' voice, sufficiently ensured that payment orders faxed by Regatos were in fact authorized by him. Despite the absence of other procedural safeguards such as telephone logs, recorded conversations and passwords, I find the security procedure followed by the Sao Paulo office, coupled with the signature comparison done at the New York office, to be commercially reasonable.

### 3. There Is a Material Issue of Fact Regarding Whether the Bank Complied with the Security Procedure

The last remaining question is: Did CBNY comply with the agreed-upon security procedures in executing the two payment orders in issue? The answer to this question determines who will bear the burden of the loss. "If the bank accepts an unauthorized payment order without verifying it in compliance with a security procedure, the loss will fall on the bank." *Banque Worms,* 568 N.Y.S.2d at 549, 570 N.E.2d 189. Conversely, if the Bank complied with the security procedure in good faith, the loss falls on Regatos. Here, Regatos insists that there was no telephonic confirmation for these two transfers. The Bank contends that there was.[22]

Regatos claims that in March and April of 2001, no one from CBNY or the Sao Paulo office telephoned him to verify the authenticity of the payment orders. *See* Regatos Dep. at 35 ("If I had received [a call], I would tell them that I didn't ask, I didn't give orders or permission."). When he learned of the two transfers, Regatos requested copies of the payment orders from the Sao Paulo office. *See* Regatos Aff. ¶ 8. Upon inspection, he discovered that the signatures on the payment orders were identical to his. *See id.* Plaintiff suspects that his business partner, Luiz Fernando Mello, obtained his signature from some other document and used it to defraud him. *See id.* ¶ 9. If this is the case, signature comparison would have been futile. Telephonic verification, on the other hand, likely would have prevented the purported fraud.

The Bank claims that there was telephonic verification at the Sao Paulo office before the payment orders were dispatched to New York. *See* Abadi Aff. ¶ 6. After having examined the payment orders, Abadi is confident that telephonic verification was obtained based on the Sao Paulo office procedures and the fact that the payment orders bear her signature and order numbers. *See id.* Abadi admits, however, that she does not remember the specific transactions in issue. *See id.*

Regatos' testimony is sufficient to create an issue of fact. American courts long ago rejected the notion that a party to a litigation is incompetent as a witness. *See* Fed. R.Evid. 601. Regatos *is* a competent witness, although a supremely interested one. In this case, however, the evidence offered by the Bank is not overwhelming. That being so, Regatos' testimony is sufficient to create a triable issue of fact—it is not significantly weaker, or stronger, than the Bank's. It is for the jury to determine whether Regatos is credible.

## IV. CONCLUSION

For the reasons stated above, the Bank's motion for summary judgment is denied. The Clerk of the Court is directed to close this motion. A trial has been scheduled in Courtroom 12C for 10:00 a.m. on March 31, 2003.

SO ORDERED.

---

**22.** Although the Bank claims that Regatos did confirm the wire transfer telephonically, it does not claim that it is entitled to summary judgment on that question.